RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0189p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

FREDDIE MCNEILL, JR.,

>    *Petitioner-Appellant*,

        *v.*

MARGARET BAGLEY, Warden,

>    *Respondent-Appellee*.

No. 19-3850

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:02-cv-01645—Dan A. Polster, District Judge.

Argued: May 20, 2021

Decided and Filed: August 20, 2021

Before: CLAY, GIBBONS, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Justin C. Thompson, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Justin C. Thompson, Jacob Cairns, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

     GIBBONS, J., delivered the opinion of the court in which GRIFFIN, J., joined. CLAY, J. (pp. 23–51), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.   Freddie McNeill Jr. was convicted and sentenced to death in Ohio state court for the aggravated murder of Blake Fulton.   McNeill appeals the district court's denial of his petition for habeas corpus, in which he argued that the prosecution in his case failed to turn over material under *Brady v. Maryland* and created a false impression in violation of *Napue v. Illinois.*   The alleged *Brady* material included two police reports, one summarizing an interview with the prosecution's primary witness, Robert Rushinsky, who initially failed to—but ultimately did successfully—identify McNeill as the culprit, and the other detailing a potential suspect who was quickly dismissed as a suspect by the police.   It also included three audio recordings, one of the same Rushinsky interview addressed in the report, a second Rushinsky interview, and a third interview with a potential alibi witness, Marko Roseboro.   The warden concedes that these materials were withheld (with the exception of the audio recording of the first Rushinsky interview, which was actually played at trial), but argues that McNeill's arguments are procedurally defaulted and, in the alternative, that none of the evidence was material as defined by *Brady*.   We agree as to the materiality of the evidence and affirm the district court.   We also agree with the district court that the prosecution did not create a false impression at trial.

I.

A.

McNeill was convicted of the aggravated murder of Blake Fulton in April 1995 and sentenced to death the following month.   The Ohio Supreme Court presented the facts as follows:

> On the evening of May 13, 1994, Blake Fulton and Robert Rushinsky drove about the city of Lorain seeking to purchase crack cocaine.   Seeing several men they believed to be crack dealers at the corner of Massachusetts Avenue and G Street, the two stopped.   As was customary, the first dealer to the car, McNeill, got the sale.

Fulton and Rushinsky knew McNeill from prior drug transactions. Rushinsky, who was riding in the front passenger seat of the two-door car, let McNeill into the back. As McNeill directed, Fulton drove south on Massachusetts Avenue and headed for McNeill's residence, where McNeill stated he kept the crack cocaine. As they drove, McNeill asked Fulton for twenty dollars. Fulton replied: "No. * * * You know how it works. I want to see [the crack] first." Fulton and McNeill continued to argue about the money. When the trio reached McNeill's house, Fulton stopped the car. McNeill produced a gun, saying, "This is a stickup," and "I want the money." Fulton jumped from the car and ordered McNeill out. As Rushinsky leaned forward and opened his door, McNeill grabbed the keys from the ignition and jumped out.

McNeill aimed his gun at Rushinsky and asked if he had any money. Rushinsky replied he had none. McNeill then pointed the gun at Fulton, saying, "You don't think this gun's real?" and "You don't think this thing's loaded?" Fulton told McNeill to return his keys. After further argument, McNeill walked away. Fulton, who was a locksmith, got into his car and attempted to start it using his locksmith's tools.

While Fulton was trying to start the car, McNeill returned. McNeill put his gun to Fulton's head, said, "Played me for a bitch," and shot Fulton. Fulton died several hours later.

The grand jury indicted McNeill on one count of aggravated murder, R.C. 2903.01(B), with a robbery-murder specification, R.C. 2929.04(A)(7), and a firearm specification, R.C. 2941.141. In addition to Rushinsky, four young children who were playing nearby saw and heard many of the events surrounding the murder. The trial judge questioned the children, who were all under the age of ten, and determined they were competent to testify.

*State v. McNeill*, 700 N.E.2d 596, 600−01 (Ohio 1998) (alteration in original).

Prior to trial, McNeill filed numerous discovery motions requesting, among other things, all material favorable to his defense. The state responded that there was "no evidence known to the State which is favorable to the Defense." DE116-1, Ct. of Common Pleas R., Page ID 900.

The case proceeded to trial. At trial, the prosecution relied heavily on Rushinsky's testimony because Rushinsky had been present with Fulton at the time of the murder. The police had an audio recording of their first interview with Rushinsky, which took place the night of the shooting. During recess, counsel and the court listened to the recording but it was not entered into evidence. The court agreed with McNeill's counsel that the recording revealed

inconsistencies in Rushinsky's testimony and allowed counsel to cross-examine Rushinsky on those inconsistencies, including the fact that Rushinsky testified at trial that he knew McNeill, which contradicted his statement in the recording that Fulton was the one who had known McNeill and not Rushinsky. Defense counsel also cross-examined Rushinsky about his drug use, highlighting that Rushinsky was high on crack cocaine and had consumed a significant amount of alcohol at the time of the murder. When asked about the inconsistent statements regarding his prior knowledge of McNeill, Rushinsky said that "[a]t the time of the police [interview] I was upset" and that he was "not lying [on the stand]." DE117-4, Trial Tr., Page ID 4699.

The state bolstered Rushinsky's testimony with the eyewitness testimony of four children who were also present near, or in the vicinity of, the site of the murder. The children were all under the age of ten, and so the court examined them each individually for competency. The court determined that the children were all competent to testify. One of the children, T.R., was specifically familiar with McNeill and able to identify him because the two were neighbors. McNeill's ex-girlfriend, Kimberly Sanford, also testified that McNeill had threatened her with a gun and demanded $30 the same day as the murder.

Following trial, the jury found McNeill guilty of murder. The jury also found proof beyond a reasonable doubt of aggravating circumstances—that McNeill had committed the murder during aggravated robbery. The court found that McNeill's mitigation evidence did not outweigh the aggravating factor and imposed the death penalty.

B.

McNeill directly appealed his conviction to Ohio's Ninth Judicial Court of Appeals. The appellate court affirmed, *State v. McNeill*, No. 95CA006158, 1997 WL 177635, at *1 (Ohio Ct. App. Apr 1, 1997), as did the Ohio Supreme Court, *McNeill*, 700 N.E.2d at 601. McNeill unsuccessfully petitioned for certiorari to the United States Supreme Court. *McNeill v. Ohio*, 526 U.S. 1137 (1999).

In preparation for postconviction proceedings, McNeill filed a public records request with the Lorain County Police Department ("LCPD"). He requested "[a]ny and all records pertaining

to or relating to any and all investigations, arrests, prosecutions and the like of Freddie McNeill, Jr." and "[a]ny and all records pertaining to or relating to the homicide of Blake A. Fulton." DE116-3, Postconviction R., Page ID 2482. The LCPD provided numerous records in response but left out some records that had been disclosed when Fulton's family filed a suit for victim reparations. McNeill's counsel later obtained these undisclosed records. They included a police report (hereinafter "Rushinsky report") detailing Rushinsky's interview with the police on the night of the shooting. The report said that police showed Rushinsky a "photo array of polaroid photos, which included Freddie McNeill," and that Rushinsky "failed to pick out anybody" from the lineup. *Id.* at Page ID 2479. The report went on to say that during the same interview Rushinsky positively identified McNeill after being shown a succession of mug shot photos. The undisclosed evidence also included a second police report detailing the very early stages of the police investigation. The report detailed an early suspect—"a black male wearing blue jeans and a gray sweatshirt" who had "abandoned a vehicle at" an intersection near where Fulton was murdered. *Id.* at Page ID 2480. The report concluded by noting that the police located the man and showed him to Rushinsky, who "stated that [the suspect] was not involved [in the shooting]." *Id.*

In 1996, McNeill moved for postconviction relief in the Ohio courts, bringing nineteen claims for relief. One of these was a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), that the prosecutor had suppressed material and exculpatory evidence: "A statement of Robert Rushinsky which conflicts with his trial testimony . . .; [a] description of the clothing worn by Mr. Fulton's assailant which indicates a second or another person was at the crime scene . . .; [and a] statement of Kimberly Sanford." DE116-3, Appellate R., Page ID 2090. The allegedly material statements by Rushinsky included the fact that "Rushinsky could not identify Freddie from a polaroid photographic line-up the evening of the shooting," which McNeill argued conflicted with Rushinsky's in court identification. *Id.* at 2091. The state responded that the Rushinsky report was not properly discoverable under Ohio Criminal Rule 16 because it contained "[n]otes made by a police officer," rather than a statement made by someone testifying at trial. DE 116-4, Postconviction R., Page ID 2646. The state further noted that the report simply summarized the interview and that the tape of the interview was played during trial. *Id.* As to the report detailing the alternative suspect, the state argued that "[a] reading of the police

report reveals that this person had nothing to do with the crime and that the evidence contained in [the report] is not exculpatory." *Id.* at Page ID 2647.  The Ohio court of common pleas denied McNeill's petition on the grounds that (1) the Rushinsky report was not discoverable under Ohio Criminal Rule 16(B)(1)(g) and that the state had provided McNeill with the recording of the interview in compliance with Ohio criminal procedure, and (2) that the report of the alternative suspect was not exculpatory or even relevant because police investigated and dismissed the suspect.  The Ohio appellate court affirmed in part and reversed and remanded in part.  *State v. McNeill*, 738 N.E.2d 23, 28–31 (Ohio Ct. App. 2000) (*McNeill I*).  Pertinent to this appeal, the court held that with respect to his *Brady* claim, "none of [McNeill's] evidence even suggested that the state did anything improper.  Moreover, he failed to demonstrate that he could not have raised this issue at trial or on appeal." *Id.* at 28.  McNeill petitioned for certiorari to the Ohio Supreme Court, but his petition was denied.  *See State v. McNeill*, 731 N.E.2d 1140 (Ohio 2000) (table); *State v. McNeill*, 758 N.E.2d 1149 (Ohio 2001) (table).

In 2002, McNeill petitioned the United States District Court for the Northern District of Ohio for a writ of habeas corpus.  He raised twenty-six grounds for relief, one of which was his claim that the prosecution failed to disclose the two police reports in violation of *Brady*.  McNeill also sought to conduct further discovery in his case because, he argued, the prosecution had failed to supply all the relevant evidence during trial.  To support his discovery motion, McNeill pointed to the two police reports: the Rushinsky report and the report identifying an alternate suspect.  The court granted this motion regarding materials McNeill sought from the Lorain County Police Department and the state turned over eight previously undisclosed recordings including the audio recording of the Rushinsky interview—the same interview that was played during the trial and was the subject of the withheld police report described above.  There was another, separate recording of a second interview with Rushinsky in which Rushinsky told the detective that the shooter's hat was "green." DE133-3, Tr., Page ID 6056.  The detective corrected Rushinsky and said "[t]hat hat ain't green," to which Rushinsky replied "[i]t's like a khaki color, isn't it?" *Id.*  The detective confirmed that the hat in question was "[l]ike a beige color." *Id.*  A third recording memorialized the police interview with Marko Roseboro, a friend of McNeill's.  During the interview, Roseboro claims that McNeill picked him up at 6:00 on the evening of the murder.

McNeill moved for a new trial in the Ohio state court based on this newly discovered evidence. He then moved to hold his federal habeas case in abeyance until the state court had decided whether to grant him a new trial. The federal court granted his motion.

The Ohio trial court denied his motion for a new trial. Ohio law allows a criminal defendant to move for a new trial when new evidence is discovered "which the defendant could not with reasonable diligence have discovered and produced at the trial." Ohio Crim. R. 33(A)(6). If the motion for a new trial is made more than 120 days after the verdict, the burden is on the defendant to show "by clear and convincing proof that [he] was unavoidably prevented from the discovery of the evidence upon which he must rely." Ohio Crim. R. 33(B).

In McNeill's case, the trial court held that "Ohio courts have adopted a reasonableness standard" to govern the time limit within which a criminal defendant must file a motion for a new trial after discovering evidence. DE118-1, Ohio Tr. Ct. Decision re. New Trial, Page ID 5271. The Ohio trial court applied this reasonableness standard and held first that McNeill had waited an unreasonable amount of time (more than three years) to file his motion after discovering the new evidence. The court further held that the newly discovered evidence was not substantially likely to lead to a different outcome at trial.

The Ohio appellate court affirmed. *State v. McNeill*, No. 15CA010774, 2016 WL 4426416, at *1 (Ohio Ct. App. August 22, 2016) (*McNeill II*). The court held that the delay between McNeill learning of the new evidence and moving for a new trial was unreasonable, and so it did not analyze the merits of his *Brady* claim. *Id.* at *3.

McNeill's federal habeas case was reopened in August 2017. McNeill amended his petition to add the claim that the prosecution "made materially false statements during the trial in violation of [his] … rights" under *Napue v. Illinois*, 360 U.S. 264 (1959). DE120, Mot. to Amend, Page ID 5645.

Because the Ohio court had denied McNeill's motion for a new trial, the eight audio recordings, including the Rushinsky and Roseboro interviews, were not part of the federal record. McNeill moved to expand the record to include the newly discovered evidence, and the district court granted his motion. He moved again to expand the record in November 2018, this

time to add the affidavit of his ex-girlfriend Kimberley Sanford. In the affidavit Sanford recanted her trial testimony that McNeill had violently threatened her with a gun on the day of the murder in a dispute over $30 and stated that the prosecution had heavily leaned on her to testify. McNeill argues that the affidavit supports his claim of actual innocence, thus permitting him to overcome any procedural barriers to the merits of his arguments. The court granted this motion as well.

The district court denied McNeill's habeas petition on August 26, 2019. *See McNeill v. Bagley*, No. 1:02 CV 1645, 2019 WL 4017047, at *1 (N.D. Ohio Aug. 26, 2019) (*McNeill III*). The court granted McNeill a certificate of appealability to this court on McNeill's seventh and twenty-seventh claims: the *Brady* and *Napue* claims concerning the withheld evidence. *Id.* at *65. McNeill timely appealed.

## II.

McNeill makes two interrelated arguments on appeal. First, he argues that the state withheld material evidence in violation of *Brady*. Second, he asserts that the prosecution "created a false impression at trial in violation of *Napue*" when it played the audio recording of the Rushinsky interview without disclosing that Rushinsky had failed to identify McNeill in the first photo lineup he was shown in that interview. CA6 R.24, Appellant's Br., at 11, 63 (emphasis omitted). We turn first to the question of whether McNeill procedurally defaulted these arguments below.

We review the district's determination as to procedural default de novo. *Lott v. Coyle*, 261 F.3d 594, 606 (6th Cir. 2001). Procedural default is generally an affirmative defense that the state must either assert or waive. *Trest v. Cain*, 522 U.S. 87, 89 (1997) ("[P]rocedural default is normally a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter." (cleaned up)); *Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) (en banc); ("[T]he Warden has not raised the issue of procedural default and has thereby waived it."); *Slagle v. Bagley*, 457 F.3d 501, 514 (6th Cir. 2006) (holding that procedural default can be waived by failure to assert it). A claim rejected by the state court is procedurally defaulted before the federal court where "there is a state procedural rule that is applicable to the

petitioner's claim and . . . the petitioner failed to comply with the rule[,] . . . the state courts actually enforced the state procedural sanction[,] . . . [and] the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim." *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). In order to constitute an adequate and independent state bar, a state procedural rule must be "firmly established and regularly followed." *Parker v. Bagley*, 543 F.3d 859, 861 (6th Cir. 2008).

The relevant pieces of allegedly withheld evidence can be grouped into two categories for procedural purposes because they were discovered by McNeill and addressed by the Ohio courts at different times. The first (Group 1) includes two police reports, one summarizing the Rushinsky interview and one detailing an alternative suspect that the police briefly investigated. Both were discovered in 1996 when McNeill's counsel requested files from the Ohio Attorney General related to Fulton's family's victim compensation suit. The Ohio trial court addressed this evidence when it denied McNeill's 1996 motion for post-conviction relief, holding that the reports were not discoverable under Ohio Criminal Procedure. The appellate court affirmed without extensive analysis. DE116-4, Postconviction R., at Page ID 2732−33; *McNeill I*, 738 N.E.2d at 28.

The federal district court opined that McNeill's invocation of the police report detailing the alternative suspect was barred by the Ohio Supreme Court's application of *res judicata*, because the Ohio appellate court stated in *McNeill I* that McNeill had "failed to demonstrate that he could not have raised this issue at trial or on [direct] appeal." *McNeill III*, 2019 WL 4017047, at *51(quoting *McNeill I*, 738 N.E.2d at 28).[1] However, because the warden had not argued procedural default before the district court, it found the defense waived and analyzed the claim on the merits. *Id.* We agree with the district court, and we further note that the warden also waived the procedural default defense as to the other report in Group 1: the report detailing the Rushinsky interview, by failing to raise the defense of procedural bar before the district court. *Getsy*, 495 F.3d at 317.

---

[1]The Ohio Supreme Court did not explicitly apply the doctrine or use the words *res judicata*.

The second category of allegedly withheld evidence (Group 2) consists of the eight audio recordings, including the two Rushinsky interviews (the one in which he failed to initially identify McNeill and the one in which he referred to the shooter's hat as "green") and the Roseboro interview (in which he said that McNeill picked him up at 6:00 on the night of the murder). These were discovered in 2002 when McNeill, shortly after filing his habeas petition, moved for discovery from the LCPD. These recordings were the basis for McNeill's motion for a new trial, which the Ohio courts denied as untimely. *McNeill II*, 2016 WL 4426416, at *3. These eight recordings were also the subject of McNeill's first motion to expand the record, which the district court granted.

The district court held that the Group 2 evidence was procedurally defaulted because the Ohio Supreme Court's decision that McNeill's motion for a new trial was untimely was an adequate and independent state bar. *McNeill III*, 2019 WL 4017047, at *51 (analyzing *McNeill II*). This also applied to his *Napue* claim, which was raised at the same time as the Group 2 evidence. Ohio Criminal Procedure Rule 33(B) states that a defendant must move for a new trial based on newly discovered evidence within 120 days of the issuance of the verdict unless the defendant can demonstrate by clear and convincing evidence that "the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely." Because McNeill requested all relevant material from the prosecution before trial and was not given the Group 2 evidence, he argues, and we agree, that he was able to meet this standard by clear and convincing evidence. Rule 33(B) does not spell out how quickly a defendant must move for a new trial under these circumstances, but the Ohio Court of Appeals held in *McNeill II* that "a reasonableness standard applies." *McNeill II*, 2016 WL 4426416, at *2. The court went on to hold that McNeill's motion was not reasonable because he waited more than three years after learning of the new evidence to move for a new trial. The district court held that this reasonableness standard constituted an adequate and independent state grounds to bar habeas review, and that McNeill's claim as to Group 2 was therefore procedurally defaulted. *McNeill III*, 2019 WL 4017047, at *49–51.

McNeill now argues that the reasonableness standard is not an adequate and independent state bar—and therefore his claim is not procedurally defaulted—because the standard was not

"firmly established and regularly followed" at the time of the Ohio Appellate Court's decision. CA6 R.24, Appellant's Br., at 53 (quoting *Walker v. Martin*, 562 U.S. 307, 316 (2011)). In addressing this question, we must ask whether McNeill "could . . . be deemed to have been apprised of the rule's existence." *Parker*, 543 F.3d at 861 (alteration in original) (quoting *Fautenberry v. Mitchell*, 515 F.3d 614, 640 (6th Cir. 2008)).

It is true that the Ninth Appellate District of Ohio, the District containing McNeill's trial court, had previously applied the reasonableness standard. *See State v. Davis*, No. 12-CA-010256, 2013 WL 936241, at *3 (Ohio Ct. App. Mar. 11, 2013); *State v. Cleveland*, No. 08-CA-009406, 2009 WL 224505, at *12 (Ohio Ct. App. Feb. 2, 2009). Other districts had also adopted this standard. *See State v. Griffith*, No. 2005-T-0038, 2006 WL 1585435, at *2–3 (Ohio Ct. App. June 9, 2006) (Eleventh District); *State v. Newell*, No. 84525, 2004 WL 2931000, at *2 (Ohio Ct. App. Dec. 16, 2004) (Eighth District). However, it is also true that the Ohio Supreme Court has never formally adopted this rule, and in fact has held that Rule 33(B) "sets forth the grounds on which the trial court may grant a motion for a new trial" but "does not otherwise limit the time for filing a motion for a new trial based on newly discovered evidence." *State v. Davis*, 959 N.E.2d 516, 522 (Ohio 2011).

It is at best unclear whether this rule was firmly and clearly established. A definitive answer to this question is not, however, necessary to the resolution of this case because the answer to the merits question is clear. The evidence allegedly withheld in Group 2 was not material under *Brady* and does not support a claim under *Napue* that the prosecution knowingly presented false evidence, so it is unnecessary for us to reach a determination on the question of procedural default. *Hudson v. Jones*, 351 F.3d 212, 215−16 (6th Cir. 2003). Because the warden waived the defense of procedural default as to Group 1 and we decline to decide the question as to Group 2, we address the merits of McNeill's full *Brady* and *Napue* claims.[2]

---

[2]Because we do not find procedural default, we need not address McNeill's arguments that he could overcome default through cause and prejudice or through actual innocence.

III.

A.

The parties agree that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies in this case. 28 U.S.C. § 2254; *see also* Oral Argument at 24:28−27:57, https://www.opn.ca6.uscourts.gov/internet/court_audio/aud1.php. AEDPA states that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* at § 2254(d). Accordingly, in order to succeed, McNeill must demonstrate that the Ohio Supreme Court's application of *Brady* was contrary to or an unreasonable application of established federal law. *Id.* He fails to do so because, even accepting that much of the material before us today was indeed withheld, it was not material considering its limited value and the weight of the other evidence supporting McNeill's conviction.

B.

Under *Brady v. Maryland*, the prosecution in a criminal case has a constitutional duty to disclose material, exculpatory evidence. 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused . . .; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281−82 (1999). Favorable evidence includes all evidence that creates a reasonable doubt, whether it is exculpatory or impeachment evidence. *Id.* at 282; *see also Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008). The prejudice prong is "sometimes referred to as the 'materiality' requirement." *Bies v. Sheldon*, 775 F.3d 386, 397 (6th Cir. 2014). Evidence is material (and so shows prejudice) if there is a "reasonable

probability . . . that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Jells*, 538 F.3d at 501−02. In order to demonstrate a reasonable probability, the petitioner must "sufficiently undermine[] confidence in the outcome of the trial." *Id.* at 502 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). We evaluate the evidence as a whole, rather than on an individual basis, in order to determine whether it was material. *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

i.

The first inquiry is the favorability of the evidence. This is a relatively low threshold for a petitioner to meet: the evidence must simply be exculpatory or impeaching. *Strickler*, 527 U.S. at 281−82. For this inquiry, it is helpful to evaluate each piece of evidence individually, as each piece is either individually favorable or not to McNeill. *See e.g., Hughbanks v. Hudson*, 2 F.4th 527, 539–43 (6th Cir. 2021). First, we consider the two reports from Group 1. The Rushinsky report is undeniably favorable because it would provide impeachment evidence against Rushinsky. *See id.* It alone included the information that Rushinsky failed to identify McNeill in the first group of photos he was shown. McNeill's counsel was unable to cross-examine Rushinsky on this point. The importance of this deprivation, however, is minimized by the fact that Rushinsky was shown the second photo array a short time later and promptly identified McNeill. Moreover, the defense cross-examined Rushinsky about his drug use the night of the killing and his inconsistent testimony that he had never met McNeill before the night of the shooting. The second report, which detailed the alternative suspect, is less clearly favorable. Although the report would have informed McNeill and his defense counsel that the police had, at one point, briefly considered someone other than McNeill as the possible shooter, the report concludes that Rushinsky definitively stated that the other individual "was not involved [in the shooting]." DE116-3, Postconviction R., Page ID 2480. If the police have "substantial exculpatory evidence to conclude that [an individual] was no longer a suspect, *Brady* [does] not apply." *Coe v. Bell*, 161 F.3d 320, 345 n.4 (6th Cir. 1998). The suspect detailed in the police report was definitively eliminated early as a suspect by Rushinsky's statement that he was not the murderer. The quick removal of this suspect from the investigation means that this report is

not, in fact, favorable to McNeill.  The alternative suspect report does not have a clear tendency to exonerate McNeill.[3]

The Group 2 evidence included audio recordings of various police interviews.  At issue are audio recordings of the Rushinsky and Roseboro interviews.  These pieces of evidence provide little that is favorable to McNeill.  The audio recording of the first Rushinsky interview does not include any indication that the police showed Rushinsky a photo of McNeill in the initial lineup, only that they showed Rushinsky some unidentified photos and that he did not pick anybody out.  It also includes his positive identification of McNeill a short time later.  It is doubtful that the Rushinsky recording would have any tendency to exonerate McNeill.  The second interview includes Rushinsky's discussion of the color of the suspect's clothes, which at most would have cast some doubt on his memory of the true color of the suspect's clothing.  Given Rushinsky's presence at the murder scene and his very explicit testimony about McNeill's actions, this recording would have little "tendency to exonerate" McNeill.

The Roseboro interview arguably would have provided something of an alibi for McNeill.  Roseboro testified that McNeill came by while he was washing his car on the day of the murder.  According to Roseboro, McNeill promised to pick him up at 6:00 that day and did so.  McNeill was alone at that time.  Roseboro refused to answer questions about whether the men picked up anyone else and ultimately refused to answer any more questions.  He denied knowing Blake Fulton.  In considering the Roseboro interview's import, we look to other evidence of the time of the murder.  The murder occurred on May 14.  We know from the children's testimony that they were still playing outside and could see what happened.  Rushinsky's testimony includes a detailed account of the activities of himself and Fulton from 5:00–5:30 p.m. until the time of the murder, which he estimated to be 7:30 or 8:00 p.m.  He noted that it was still light out and he could see.

---

[3]The dissent argues that the favorability of this report "is not limited to the evidence about another suspect" because the report included a description of the suspect that conflicted with "both descriptions . . . that had been provided to the officers first on the scene."  Dissent at 32.  As the dissent notes, there is no information in the record about who gave these conflicting descriptions (that "the suspect was wearing a red shirt or a gray sweatshirt") to the police.  *Id.*  We do not know if it was one of the child eyewitnesses (who the dissent later argues were not credible enough to count their testimony), or some other unnamed witness.  Without any information on who provided these fleeting descriptions, we do not believe that they amount to favorable evidence for McNeill.  In the event that they are favorable, they are certainly not material, for the same reasons we explain below.  *See infra* III.B.iii.

Given the other evidence at trial, Roseboro's statement that McNeill picked him up at 6:00, absent any information about what happened after that, lacks sufficient precision to be readily accepted as an alibi defense. It is weak evidence and of limited value.

ii.

The second prong is that the favorable evidence must be withheld. This requires that the evidence be in the exclusive control of the state. *United States v. Graham*, 484 F.3d 413, 414−15 (6th Cir. 2007). There is no question as to the Group 1 police reports: McNeill requested discovery on more than one occasion before trial and the police failed to turn over the reports.[4] They were internal documents that were in the exclusive control of the state.

The Group 2 audio recordings, however, were for the most part not in the exclusive control of the government. First, the audio recording of the first Rushinsky interview was played during trial, allowing both parties access to it. Both parties agreed that it was not "necessary to put [the] tape in evidence." DE117-4, Trial Tr., Page ID 4684−85. McNeill's counsel noted that he "would like to have the opportunity to at least made a copy of the tape[,]" to which the court responded "[s]ure." *Id.* at Page ID 4685. Once it was played at trial, the tape was surely not in the exclusive control of the government or withheld from the defense. "Generally speaking, *Brady* does not apply to delayed disclosure, but only to a complete failure to disclose," unless there is a prejudice arising from the delay. *United States v. Spry*, 238 F. App'x 142, 147 (6th Cir. 2007) (citing *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002)). Where, as here, evidence was disclosed during trial, there is no *Brady* violation unless the defendant can specifically demonstrate prejudice resulting from the delay. *Id.* The recording of the second Rushinsky interview, which included the back and forth about the color of the hat in question, was in the government's exclusive control but that is irrelevant because, as we noted above, it was not favorable.

Finally, to the extent the Roseboro interview is favorable, it is also alibi evidence and presumably within McNeill's knowledge. McNeill submitted a Notice of Alibi for himself

---

[4]We also note that the warden's arguments that the two police reports were not discoverable under Ohio law are unavailing. State procedural rules do not define materiality for *Brady* purposes. *United States v. Armstrong*, 517 U.S. 456, 475 (1996) (Breyer, J. concurring).

before the trial court, which stated that "he propose[d] to offer testimony that he was at the residence of his mother in Lorain, Ohio." DE116-1, Ct. of Common Pleas R., Page ID 1008. Putting that conflicting alibi aside, McNeill would logically have been aware of where he was at the time of the shooting and, if it was with Marko Roseboro, he could have obtained Roseboro's testimony to that effect on his own. Roseboro's alibi evidence cannot have been in the exclusive control of the government because he claims that he was with McNeill at least as of 6:00p.m.

After reviewing the evidence for favorability and being withheld, we are left only with the Rushinsky report. We turn to examine the materiality of this report to determine whether the Ohio court's determination that it does not constitute a *Brady* violation was contrary to, or an unreasonable application of, federal law.

iii.

The prejudice prong essentially asks whether the withheld favorable evidence was also material. *Strickler*, 527 U.S. at 289. The standard is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (quoting *Kyles*, 514 U.S. at 435). In applying this standard, "we consider [the withheld material] in light of the evidence available for trial that supports the petitioner's conviction." *Jells*, 538 F.3d at 502. McNeill argues that the Rushinsky report is material and that had he had access to it he would have been able to more thoroughly impeach Rushinsky on the stand. He further argues that the remaining evidence could not have supported his conviction. He is wrong—with multiple other eyewitnesses naming McNeill as the perpetrator, the testimony of his ex-girlfriend as to his behavior the day of the shooting, and the physical proximity of the shooting to McNeill's house, there was ample other evidence rendering the withheld Rushinsky report immaterial under the *Brady* standard.

Other than Rushinsky's testimony, the most significant evidence in McNeill's case is the testimony of the four children who either witnessed the murder or saw and interacted with McNeill shortly before the murder. The first witness, T.R., said that "Freddie shot this . . . man." DE117-4, Trial Tr., Page ID 4775. T.R. testified that McNeill was her next-door neighbor, and so she knew and recognized him prior to the shooting. *Id.* at Page ID 4775–76. She said that

while she was playing outside with her three other friends, McNeill shot the victim in the head while the victim was "sitting in the car talking to Freddie." *Id.* at 4776. This description is consistent with Rushinsky's story, which was that McNeill shot Fulton while Fulton was still sitting in the driver's seat of the car. *See id.* at Page ID 4680 ("[F]inally Freddie got to the car, walked up to the window, and at that time Blake sat up in his car, and when he did, Freddie put the gun to [the] back of his head and says, 'Played me for a Bitch,' and pulled the trigger."). During defense counsel's cross examination, T.R. stated again that the victim was inside the car while McNeill was standing outside the car. True, T.R. later changed the details of her story, telling defense counsel that she "heard the gun go off" but "did not [see it]." *Id.* at Page ID 4791. Later on, defense counsel cross examined another child, C.S., who said that T.R. was inside the house at the time that McNeill shot Fulton. *Id.* at Page ID 4866. But these inconsistencies were aired on cross examination in front of the jury, allowing the jury to reach a credibility determination as they would any other witness.

The next witness was B.P., who testified that she was at T.R.'s house riding her bike at the time of the shooting.[5] B.P. told the jury that she saw a car pull up, McNeill get out of the car, and then shoot someone in the car. *Id.* at Page ID 4811−15. B.P.'s testimony was also consistent with the testimony of T.R. and Rushinsky that there were two people in the car at the time of the shooting, and that McNeill ran away after shooting Fulton.

R.G. testified next. R.G. testified that he was present for the shooting, but he was inconsistent on whether or not he actually witnessed McNeill kill Fulton. R.G. saw McNeill, and her friend Baby J. told her who he was. Later, R.G. saw blood on Fulton's head while he was still in his car, and saw McNeill run away.

The final child to testify was C.S., who said that he and the other children were riding bikes at the time of the shooting. C.S. witnessed the shooter shoot Fulton in the head, and T.R. told him that the man he had seen was McNeill. T.R. knew McNeill because the two were next door neighbors. C.S. had seen McNeill before but did not know his name.

---

[5]On cross examination, defense counsel pointed out the inconsistencies between the children's accounts of their activities—T.R. said that the children were playing hide and seek while B.P. said that they were riding bikes. R.G., on the other hand, said that they were playing ball.

McNeill argues that the children's testimony was "inconsistent, unreliable, and in some instances, admittedly coached." CA6 R.24, Appellant's Br., at 35. But the trial judge carefully questioned the children before judging them competent, and McNeill's attorney had ample opportunity to cross examine each child to make the jury aware of any inconsistencies in their testimony. It is not for us to make a determination as to the children's—or any other witness's—credibility. *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir. 1983) ("[C]redibility is not a matter of review for a federal habeas corpus court . . . ."); s*ee also Brown v. Davis*, 752 F.2d 1142, 1147 (6th Cir. 1985) ("The issue of credibility, the demeanor of the parties, and the weighing of the evidence were properly for the jury."); *Wilson v. Sheldon*, 874 F.3d 470, 477 (6th Cir. 2017). Rather, we must give due deference to the jury's credibility determinations, as they saw the witness's testimony and cross examination on the stand. *Brown*, 752 F.2d at 1147 ("[T]he jury's resolution of questions of credibility and demeanor . . . is entitled to 'special deference.'" (quoting *Patton v. Yount*, 467 U.S. 1025, 1038 (1984))). The dissent argues that we are required by *Kyles* to examine the quality of the children's testimony. We agree and find the testimony of four eyewitnesses to be of sufficient quality that the further impeachment of one eyewitness, even the star eyewitness, is not enough to "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The dissent is correct that the question is not whether there was sufficient evidence to convict McNeill, but whether there is a "reasonable probability" that there would have been a different result had the evidence been disclosed. There is no such reasonable probability in the face of the remaining evidence against McNeill.

The testimony of numerous eyewitnesses, children or otherwise, is unusually powerful. *See Strickler*, 527 U.S. at 293 ("We recognize the importance of eyewitness testimony . . . ."); *Kyles*, 514 U.S. at 463 (Scalia, J. dissenting) ("Even if the undisclosed evidence would have allowed the defense to thoroughly impeach Beanie and to suggest the above possibilities, the jury could well have believed *all* of those things and yet have condemned petitioner because it could not believe that *all four* of the eyewitnesses were similarly mistaken."). In *France v. Lucas* we denied a petitioner's *Brady* claim in part because another eyewitness had identified France at the scene. 836 F.3d 612, 630−31 (6th Cir. 2016). Unlike in this case, the identification was given "by an experienced DEA agent," but it was the fact that Lucas had seen France commit the crime

and identified him in court that led us to conclude that "there [was] little chance the alleged *Brady* material would have changed the outcome of [the] trial." *Id.* at 630−31.

What is more, the eyewitness testimony was not the jury's only evidence. The jury heard the testimony of Kim Sanford, McNeill's ex-girlfriend, who testified that she saw McNeill the day of the murder, and that he asked her for thirty dollars. When she refused, McNeill followed her down the street with a gun, arguing with her about the money. True, this evidence is also not, in hindsight, perfect. Sanford testified that the police gave her $220 for her help in locating McNeill after he became the primary suspect, and she in fact later recanted her testimony. Yet the jury heard Sanford testify to the fact that she had been paid for her assistance and made a credibility determination based on part on that information. And because she did not recant her testimony until August 2018, that has no bearing on the materiality of the alleged *Brady* material because it could not have changed the outcome of McNeill's trial. Sanford's evidence is compelling: McNeill threatened another person with a gun over $30 the very same day that the jury was told he shot Fulton over $20. In *Strickler*, the Supreme Court held that withheld evidence was not material in part because "[defendant] threatened [another member of the criminal enterprise] with a knife later in the evening." 527 U.S. at 292. The other significant evidence in *Strickler* was that the defendant was seen "driving [a] car . . . near the location of the murder." *Id.* Fulton was murdered very near McNeill's house—one of the identifying children was in fact his neighbor.

The final piece of evidence worth noting is the fact that Rushinsky eventually did identify McNeill in a photo lineup in the same interview with the police, although the identified photo was in a different photo lineup. We do not credit McNeill's current argument that a knocking sound in the recording could tell us that the police coached Rushinsky to identify McNeill because the evidence simply does not support it.

"The fact that any use of the evidence would be limited to impeachment mitigates the potential exculpatory impact of the evidence." *Hutchison v. Bell*, 303 F.3d 720, 743 (6th Cir. 2002). The fact that Rushinsky initially failed to identify McNeill in a photo array, considered with the other evidence presented at trial including multiple eyewitness accounts, the proximity of the murder to McNeill's home, and the testimony of his ex-girlfriend, lead us to conclude

there is no "reasonable probability that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." *Strickler*, 527 U.S. at 289 (internal quotation marks omitted). This standard requires more than a "mere 'possibility,'" but "less than proof 'by a preponderance'" that the result would have been different. *Thomas v. Westbrooks*, 849 F.3d 659, 663 (6th Cir. 2017) (quoting *Montgomery v. Bobby*, 654 F.3d 668, 679 (6th Cir. 2011) (en banc)).

It is useful to compare the case before us to those in which our court, or the Supreme Court, has found evidence to be material. In *Harris v. Lafler*, we found suppressed evidence material because it would have impeached "the *only* piece of eyewitness evidence that directly linked Harris to the shooting" and, without it "the prosecution's case was circumstantial." 553 F.3d 1028, 1033. (6th Cir. 2009). In *Smith v. Cain*, the Supreme Court similarly held that evidence was material under *Brady* when the testimony that would have been impeached was "the *only* evidence linking [the defendant] to the crime" and the withheld statements "directly contradict[ed] [the witness's] testimony." 565 U.S. 73, 76 (2012).

That is not the case here. Rushinsky's testimony may have been the strongest evidence supporting McNeill's conviction, but it was far from the only evidence. Rushinsky's identification of McNeill took place in the same interview as his failure to identify McNeill. We have previously considered whether testimony that the defense could have used for impeachment was corroborated by other evidence in the record. *Hutchison*, 303 F.3d at 743. In *Hutchison*, we considered the fact that, while the defense was unable to impeach a witness directly because the relevant impeachment evidence was withheld, there was other corroborating evidence in the record. *Id.* at 745. This other corroborating evidence "undermined . . . any impeachment value of the [withheld] evidence." *Id.* To the extent that the report would have allowed the defense to cross examine Rushinsky on his knowledge of, and ability to identify, McNeill, the jury actually heard cross examination on that very point: Rushinsky contradicted himself during his testimony as to whether he or Fulton knew McNeill before the shooting. The jury heard these inconsistencies and chose to credit Rushinsky anyway. The wealth of other evidence on which the jury could have relied, as well as the fact that Rushinsky did in fact identify a photo of McNeill prior to trial, lead us to conclude that there is no reasonable probability that the outcome

of McNeill's trial would have been different if the prosecution had turned over the Rushinsky report.

C.

Finally, we turn briefly to McNeill's *Napue* claim. McNeill argues that the prosecution "created a false impression at trial" by failing to disclose that Rushinsky initially failed to identify McNeill in his police interview. CA6 R.24, Appellant's Br., at 63 (citing *Napue*, 360 U.S. at 269) (emphasis omitted).

In *Napue*, the Supreme Court held that the prosecution in a criminal case "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." 360 U.S. at 269. "A false-testimony claim is cognizable on federal habeas review because the 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice.'" *Abdus-Samad v. Bell*, 420 F.3d 614, 625 (6th Cir. 2005) (quoting *Giglo v. United States*, 405 U.S. 150, 153 (1972)). "To prove that the prosecutor's failure to correct false testimony violated due process rights, a petitioner must demonstrate that: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false." *Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009) (citations omitted). The *Napue* standard is very similar to the *Brady* standard: "[a] false statement is material under this standard, and 'a new trial is required, if the false testimony could in any reasonable likelihood have affected the judgment of the jury.'" *Brooks v. Tennessee*, 626 F.3d 878, 895 (6th Cir. 2010) (quoting *Giglio*, 405 U.S. at 154) (alterations omitted).

McNeill argues that the state violated this rule when it played the audio recording of Rushinsky identifying McNeill because the recording did not make clear that Rushinsky initially failed to identify McNeill. CA6 R.24, Appellant's Br., at 72−73. This apparently incomplete portrayal of the Rushinsky interview, McNeill argues, was deliberately misleading. *Id.* at 73. As a preliminary matter, we note that the police questioning of Rushinsky in the tape was not actually false, as required by *Napue*. The entire audio recording was in fact played at trial, although not in the presence of the jury. And the recording also was not admitted into evidence. So the recording could not have influenced the jury in any way. Perhaps there was some

obligation on the part of the prosecutor, if he knew, to elaborate on what was happening in the tape. But that is not McNeill's argument, and certainly the prosecutor's failure to elaborate outside the presence of the jury cannot amount to a knowing use of false evidence, as *Napue* forbids.

## IV.

The only favorable, undisclosed evidence before this court today is the Rushinsky report. This report, which would have given McNeill more material with which to impeach Rushinsky, is relevant, but it is not material. There was ample alternative evidence supporting McNeill's conviction. Nor does McNeill have a viable *Napue* claim. Accordingly, we affirm the district court.

———————————

**DISSENT**

———————————

CLAY, Circuit Judge, dissenting.   In a case with no physical or forensic evidence, Petitioner Freddie McNeill, Jr., was convicted and sentenced to death for the aggravated murder of Blake Fulton.   Post-trial, McNeill discovered that the State of Ohio had suppressed various items of evidence.   Most significant was evidence showing that the State's star eyewitness, Robert Rushinsky, had failed to identify McNeill in a photo lineup conducted on the night of the crime.   The issue in this case is whether the State's suppression of evidence impeaching the testimony of its star eyewitness undermines confidence in the verdict.   The Supreme Court says yes.   *See, e.g.*, *Wearry v. Cain*, 577 U.S. 385, 392 (2016); *Smith v. Cain*, 565 U.S. 73, 75–76 (2012); *Banks v. Dretke*, 540 U.S. 668, 700–01 (2004); *Kyles v. Whitley*, 514 U.S. 419, 454 (1995); *United States v. Agurs*, 427 U.S. 97, 112 n.21 (1976); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959).   The majority says no. Therefore, I dissent.

**I.**

A.

Based on Rushinsky's trial testimony, the factual background for McNeill's conviction was summarized by the Ohio Supreme Court as follows:

> On the evening of May 13, 1994, Blake Fulton and Robert Rushinsky drove about the city of Lorain seeking to purchase crack cocaine.   Seeing several men they believed to be crack dealers at the corner of Massachusetts Avenue and G Street, the two stopped.   As was customary, the first dealer to the car, McNeill, got the sale.
>
> Fulton and Rushinsky knew McNeill from prior drug transactions.   Rushinsky, who was riding in the front passenger seat of the two-door car, let McNeill into the back.   As McNeill directed, Fulton drove south on Massachusetts Avenue and headed for McNeill's residence, where McNeill stated he kept the crack cocaine. As they drove, McNeill asked Fulton for twenty dollars. Fulton replied: "No. * * * You know how it works.   I want to see [the crack] first."   Fulton and McNeill continued to argue about the money.   When the trio reached McNeill's

house, Fulton stopped the car. McNeill produced a gun, saying, "This is a stickup," and "I want the money." Fulton jumped from the car and ordered McNeill out. As Rushinsky leaned forward and opened his door, McNeill grabbed the keys from the ignition and jumped out.

McNeill aimed his gun at Rushinsky and asked if he had any money. Rushinsky replied he had none. McNeill then pointed the gun at Fulton, saying, "You don't think this gun's real?" and "You don't think this thing's loaded?" Fulton told McNeill to return his keys. After further argument, McNeill walked away. Fulton, who was a locksmith, got into his car and attempted to start it using his locksmith's tools.

While Fulton was trying to start the car, McNeill returned. McNeill put his gun to Fulton's head, said, "Played me for a bitch," and shot Fulton. Fulton died several hours later.

*State v. McNeill*, 83 Ohio St. 3d 438, 438–49, 700 N.E.2d 596, 600–01 (1998).

B.

Later that month, McNeill was indicted by a grand jury in Lorain County, Ohio, on one count of aggravated murder, R.C. 2903.01(B), with both a robbery-murder specification, R.C. 2929.04(A)(7), and a firearm specification, R.C. 2941.141. In pretrial proceedings, McNeill filed a discovery motion requesting from the State "[a]ny books, papers, documents, photographs, tape recordings, tangible objects, buildings, or places, or copies or portions, thereof, which are material to the preparation of Defendant's defense . . ." (R. 116-1 at PageID# 888.) The State represented that it "complied with Defendant's Request for Discovery." (*Id.* at PageID# 902.) McNeill also filed a motion seeking "any exculpatory evidence that will tend to show that the crime was not committed." (*Id.* at PageID# 933.) The State responded that "it was not in possession of any evidence that tends to show the crime was not committed." (*Id.* at PageID# 968.)

Trial commenced on April 10, 1995. The State's case relied primarily on the eyewitness testimony of Rushinsky and of "four children who were playing nearby [and] saw and heard many of the events surrounding the murder." *State v. McNeill*, 9th Dist. Lorain No. 95CA6158, 1997 WL 177635, at *1 (Apr. 1, 1997). After the State examined Rushinsky, pursuant to then existing Ohio Rule of Criminal Procedure 16(B)(1)(g), defense counsel moved for "an in camera inspection of any statements, written, oral, that [Rushinsky] may have made to law enforcement

agency." (R. 117-4 at PageID# 4682.)  The State volunteered the existence of a previously undisclosed taped statement from the night of the murder.  The statement was then played, with both parties agreeing that there was no need for transcription.  In support of cross-examining Rushinsky based on the recording, defense counsel pointed out several inconsistencies between Rushinsky's trial testimony and the tape recorded statement.  The trial court agreed "that there are inconsistencies sufficient to allow the Defense to cross examine the witness, if it desires to, on the statement." (*Id.* at PageID## 4687–86.)  Although Rushinsky was cross examined based on McNeill's counsel's recollection of the recording, the tape was not placed in the record.

On April 14, 1995, the jury returned a verdict of guilty on aggravated murder and on both specifications and, on May 3, 1995, following the penalty phase of the trial, the jury returned a verdict recommending that McNeill be sentenced to death.  After conducting an independent review, the trial court sentenced McNeill to death.

## C.

On June 21, 1995, McNeill appealed his convictions and sentence to the Ohio Court of Appeals raising sixteen assignments of error.  The Ohio Court of Appeals affirmed the judgment of the trial court, *see McNeill*, 1997 WL 177635, at *14, the Ohio Supreme Court affirmed, *see McNeill*, 700 N.E.2d at 601, and the United States Supreme Court denied McNeill's petition for a writ of certiorari, *see McNeill v. Ohio*, 526 U.S. 1137 (1999).

While McNeill's direct appeal was still pending, on August 7, 1996, he filed a public records request with the City of Lorain Police Department ("LCPD") seeking all records pertaining to his case.  LCPD provided to McNeill's counsel, what it alleged, were all such records.  But McNeill then learned that the Ohio Attorney General had filed LCPD records that had not been disclosed to him in response to a claim for victim reparations filed by Fulton's family in the Ohio Court of Claims.  Included in that trove of records was an undisclosed police report from the night of the shooting stating that "Rushinsky was shown a photo array of polaroid photos, which included Freddie McNeill, upon looking at these photographs he failed to

pick out anybody."[1] (R. 116-3 at PageID# 2479.) Another undisclosed police report detailed that police were originally provided with two different descriptions of the suspect, and that police had detained someone matching one of the descriptions—"a black male wearing blue jeans and gray sweatshirt"— who had been reported for suspicious activity, but that the suspect had been released after Rushinsky stated that the person was not involved in the incident. (*Id.* at PageID# 2480.)

On September 20, 1996, McNeill filed a petition for postconviction relief in the state trial court. McNeill's second claim for relief stated that "his conviction and/or sentences are void or voidable because the prosecutor suppressed material and exculpatory evidence," including "[a] statement of Robert Rushinsky which conflicts with his trial testimony" and "[a] description of the clothing worn by Mr. Fulton's assailant which indicates a second or another person was at the crime scene." (*Id.* at PageID# 2090.) McNeill also requested discovery "as provided by the Ohio Rules of Civil and Criminal Procedure in order to fully develop and pursue this claim." (*Id.* at PageID# 2091.) The State did not dispute that the two police reports were not provided to McNeill; instead, it argued that the police reports were not discoverable.

The trial court denied McNeill's petition. The court held that under Ohio Criminal Rule 16(B)(1)(g) the State was not required to turn over the Rushinsky police report, and that, in accordance with Rule 16(B)(1)(g), a tape recording of the statement had been provided to McNeill following the State's direct examination of Rushinsky. Because police had determined that the detained black male wearing blue jeans and a gray sweatshirt was not a suspect, the trial court held that the other police report was "not exculpatory or even relevant to the present case." (R. 116-4 at PageID# 2733.) The Ohio Court of Appeals affirmed the decision. *See State v. McNeill*, 137 Ohio App. 3d 34, 41, 738 N.E.2d 23, 28 (9th Dist. 2000). According to the court, "none of [McNeill's] evidence even suggested that the state did anything improper" and, alternatively, his claim was barred by Ohio's doctrine of *res judicata* because "he failed to demonstrate that he could not have raised this issue at trial or on appeal." *Id.* The Ohio Supreme

---

[1]In a subsequent photo lineup conducted later in that interview, Rushinsky allegedly successfully identified McNeill.

Court declined to review the decision. *See State v. McNeill*, 89 Ohio St. 3d 1453, 731 N.E.2d 1140 (2000) (table).

D.

In December 2002, McNeill filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in the district court. His seventh ground for relief raised claims pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), based on the State's withholding of the two police reports. McNeill subsequently moved to conduct a record deposition of LCPD. In support, McNeill pointed to the existence of the suppressed police reports as proof that LCPD had not turned over portions of his case file. The district court granted McNeill's request on May 25, 2007.

On March 14, 2008, McNeill informed the district court that LCPD had turned over eight tape recordings that had not been previously disclosed. One of the recordings was of the interview memorialized in the undisclosed Rushinsky police report in which Rushinsky failed to identify McNeill in a photo lineup, and the parties do not dispute that this was the recording played *in camera* following the State's examination of Rushinsky. There was also a recording of a second police interview of Rushinsky in which Rushinsky identified the shooter's "green hat" before being corrected by police and told that the hat "ain't green." (R. 133-3 at PageID# 6056.) Another recording was of a police interview with a Marko Roseboro providing McNeill with an alibi. On June 23, 2011, McNeill obtained an affidavit from one of his trial counsel, Joseph Grunda, stating that he did not recall receiving from the State the evidence obtained post-trial.

Armed with this new evidence, on September 23, 2011, McNeill filed an application for leave to file a motion for a new trial in the state trial court. He subsequently filed a motion in the district court to hold his petition for writ of habeas corpus in abeyance pending his state court proceedings, which was granted. On March 20, 2015, the state trial court *sua sponte* denied McNeill's application on the grounds that the delay between the discovery of the evidence and the filing of the application was not reasonable, and alternatively, that McNeill's evidence was not sufficient to grant a motion for a new trial. On August 22, 2016, the Ohio Court of Appeals affirmed the denial of McNeill's application as untimely and did not reach the merits of

McNeill's motion. *See State v. McNeill*, 9th Dist. Lorain No. 15CA010774, 2016-Ohio-5463, ¶¶ 9, 13. On May 17, 2017, the Ohio Supreme Court declined to review McNeill's appeal. *See State v. McNeill*, 149 Ohio St. 3d 1406, 2017-Ohio-2822, 74 N.E.3d 464 (table).

## E.

In August 2017, the district court reactivated McNeill's case. On March 2, 2018, McNeill moved to supplement his *Brady* claims with the newly discovered evidence, and to add a claim under *Napue v. Illinois*, 360 U.S. 264 (1959). Because McNeill's application for leave to file a motion for new trial was denied *sua sponte* by the state trial court on timeliness grounds, McNeill never received the opportunity to add the undisclosed tape recordings to the state court record. Therefore, McNeill also filed a motion to expand the record in the case to include the undisclosed Rushinsky and Roseboro tape recordings. Respondent Warden Margaret Bagley opposed both motions. On July 9, 2018, the district court granted both motions.

McNeill then filed an Amended Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. On August 26, 2019, the district court denied all 27 grounds for relief asserted in McNeill's Amended Petition. *See McNeill v. Bagley*, No. 02-1645, 2019 WL 4017047, at *1, 12 (N.D. Ohio Aug. 26, 2019). The district court granted a certificate of appealability as to McNeill's seventh and twenty-seventh grounds for relief—his *Brady* and *Napue* claims—and declined to issue a certificate of appealability for the remaining claims. *See id.* at *65.

This timely appeal followed.

## II.

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Accordingly, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully

or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Evidence is favorable when it is "advantageous" to the defendant. *Banks*, 540 U.S. at 691. Favorable evidence is considered to have been suppressed if the evidence "had been known to the [government] but unknown to the defense." *Agurs*, 427 U.S. at 103; *Kyles*, 514 U.S. at 437–38. "Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry*, 577 U.S. at 392 (cleaned up). This materiality standard does not require the defendant to show that the "undisclosed evidence" actually "affected the jury's verdict." *Id.* at 1006 n.6. Nor must the defendant "show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Id.* at 1006 (quoting *Smith*, 565 U.S. at 75). Instead, the defendant "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (quoting *Smith*, 565 U.S. at 75); *see also Kyles*, 514 U.S. at 434 ("[T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."); *Hughbanks v. Hudson*, 2 F.4th 527, 540 (6th Cir. 2021).

Moreover, "[i]n considering whether the failure to disclose exculpatory evidence undermines confidence in the outcome, 'the omission must be evaluated in the context of the entire record.'" *Bies v. Sheldon*, 775 F.3d 386, 399 (6th Cir. 2014) (quoting *Agurs*, 427 U.S. at 112). Thus, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id.* (quoting *Agurs*, 427 U.S. at 113). And "[w]hen the State fails to turn over numerous pieces of favorable evidence, as it did in this case, the proper focus of *Brady*'s materiality inquiry is on the cumulative effect of the suppressed evidence on the outcome of the trial." *Id.* (citing *Kyles*, 514 U.S. at 436–37).

A.

McNeill alleges that the State suppressed five items of favorable evidence: 1) the police report memorializing Rushinsky's failure to identify him in a photo lineup; 2) the police report containing two different descriptions of a fleeing suspect, and detailing the apprehension of a

suspect matching one of the descriptions; 3) a tape recording of the interview in which Rushinsky failed to identify McNeill in a photo lineup; 4) a tape recorded interview of Rushinsky in which a detective can be heard correcting him on the color of the shooter's hat; and 5) a tape recorded interview with Roseboro providing McNeill with an alibi.[2]

I begin by analyzing each item of evidence individually to determine whether it was favorable and suppressed, before turning to the materiality inquiry.

B.

i.

*Rushinsky Police Report:* Rushinsky testified that he had a longstanding relationship with McNeill, and that he immediately recognized McNeill when he came over to the car to sell Fulton and him cocaine. But, unbeknownst to the jury, on the night of the shooting, Rushinsky was shown a photograph of McNeill and informed the police that McNeill was *not* the perpetrator. Even though Rushinsky later allegedly identified McNeill in a second photo lineup, evidence that Rushinsky initially failed to identify McNeill is undoubtedly favorable. *See Jamison v. Collins*, 291 F.3d 380, 385 (6th Cir. 2002) (explaining that evidence impeaching an eyewitness is favorable); *United States v. Waagner*, 104 F. App'x 521, 525 (6th Cir. 2004) ("The outcome of the unsuccessful pretrial identification constituted *Brady* material, as it was potentially exculpatory evidence."). And in its response to McNeill's petition for postconviction relief, the State conceded that it suppressed this police report.

---

[2]Although not discussed by the majority, the warden argues that the district court contravened 28 U.S.C. § 2254(e)(2) by allowing McNeill to expand the habeas record to include the Rushinsky and Roseboro recordings. However, § 2254(e)(2) only applies "where a petitioner has 'failed to develop the factual basis of a claim in State court proceedings.'" *Getsy v. Mitchell*, 495 F.3d 295, 310 (6th Cir. 2007) (quoting 28 U.S.C. § 2254(e)(2)). And "[t]he Supreme Court has held that 'failed' within the meaning of § 2254(e)(2) refers to 'a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 420, 432 (2000)). Here, McNeill is not at fault because the State concealed the recordings. Moreover, even though McNeill's counsel agreed that there was no need to make the recording of the Rushinsky photo lineup part of the state court record, due to the State's suppression of evidence there was no way for McNeill's trial counsel to know that one of those photos shown to Rushinsky was of McNeill. The recording alone only established that Rushinsky was shown "some pictures" and responded, "No. No. No. No. No." as to whether he saw "the guy who did this." (R. 133-2 at PageID# 6053.) Because, due to the State's withholding of the police report, it was impossible for McNeill's trial counsel to know that the recording formed the factual basis of a *Brady* claim, his failure to insist on making the recording a part of the trial record was not a lack of diligence.

*ii.*

*Other Suspect Police Report:* After Fulton was shot, police quickly arrived on the scene. According to a responding officer, "[u]nits first on scene gave out two descriptions of the suspect fleeing the area one being a black male wearing peach colored pants and a read (sic) shirt, and the other being a black male wearing blue jeans and gray sweatshirt." (R. 116-3 at PageID# 2480.) Police then received an anonymous tip that "a black male wearing blue jeans and gray sweatshirt had abandoned a vehicle" at a nearby intersection, "and that he'd ran southbound." (*Id.*) Police found the vehicle and determined that it was registered to a Mr. Patterson Sr., who informed them "that his son Mr. Patterson Jr. was supposed to be in charge of the vehicle." (*Id.*) "Mr. Patterson Jr. was located at [a] McDonalds," and "[d]ue to Mr. Patterson Jr. matching the description of the suspect involved in the shooting and his suspicious activity with his vehicle he was transported . . . for possible identification by Rushinsky." (*Id.*) But after "Rushinsky stated that Mr. Patterson Jr. was not involved," he was released. (*Id.*)

All of this evidence was contained in a police report that the State conceded had not been provided to the defense. The evidence is also favorable. McNeill's defense at trial was that he was the victim of a mistaken identification. But because of the State's failure to disclose this police report, McNeill was unable to inform the jury that there had been a different person suspected of committing the crime. "While the State is not necessarily required to disclose every stray lead and anonymous tip, it must disclose the existence of 'legitimate suspect[s].'" *Bies*, 775 F.3d at 400 (quoting *D'Ambrosio v. Bagley*, 527 F.3d 489, 499 (6th Cir. 2008)). "In determining what constitutes a 'legitimate suspect,' we generally look to see what evidence substantiates that the suspects may have been involved in the crime." *Hughbanks*, 2 F.4th at 536 (quoting *Gumm v. Mitchell*, 775 F.3d 345, 366 (6th Cir. 2014)). Here, Patterson matched one of the descriptions provided of the shooter, and he was seen engaging in suspicious activity near the scene of the crime. Police viewed Patterson as a legitimate enough suspect to conduct a search for him, detain him, and transport him for identification by Rushinsky. This easily satisfies the favorable element. *See Jamison,* 291 F.3d at 390–91.

The majority nonetheless holds that this report is not favorable to McNeill because "[t]he suspect detailed in the police report was definitively eliminated early as a suspect by Rushinsky's

statement that he was not the murderer." Maj. Op. at 13. It is true that we have indicated in dicta that *Brady* does not apply "if the reason that the police did not turn over inculpatory evidence about [another suspect] is that they had substantial exculpatory evidence to conclude that he was no longer a suspect" because "*Brady* does not exist to provide fodder for *misleading* reasonable-doubt defenses." *Coe v. Bell*, 161 F.3d 320, 345 n.4 (6th Cir. 1998). However, the entirety of the State's evidence exculpating Patterson was Rushinsky's statement. And that same night, Rushinsky failed to identify McNeill in a photo lineup. Thus, the exculpatory evidence was not so "substantial" that any reference to Patterson at trial would have been a "*misleading* reasonable-doubt defense[]." *Id.* And, ordinarily, "withholding knowledge of a second suspect conflicts with the Supreme Court's directive that the criminal trial, as distinct from the prosecutor's private deliberations, be preserved as the chosen forum for ascertaining the truth about criminal accusations." *Clark v. Warden*, 934 F.3d 483, 492 (6th Cir. 2019) (cleaned up); *see also Kyles*, 514 U.S. at 440; *Bies*, 775 F.3d at 400.

Furthermore, the exculpatory nature of this police report is not limited to the evidence about another suspect. First, in the recording played *in camera* following the State's direct examination of Rushinsky, defense counsel learned that Rushinsky had told police that the shooter was wearing a "tan jacket." (R. 133-2 at PageID# 6054.) This description conflicted with both descriptions of the suspect that had been provided to the officers first on the scene.[3] According to the initial descriptions provided to police, the suspect was wearing a red shirt or a gray sweatshirt. Because of the State's failure to disclose this police report, McNeill's trial counsel lost the opportunity to use these conflicting descriptions to attack Rushinsky's identification of McNeill.

Second, the fact that police received two contrary descriptions of the suspect was also exculpatory. Besides chasing Patterson, there was no evidence that police investigated these

---

[3]Although the majority correctly notes that the record is unclear as to who provided those initial descriptions, evidence that Rushinsky's description conflicted with the descriptions provided by other alleged eyewitnesses is certainly "advantageous to [McNeill]." *Banks*, 540 U.S. at 691. Moreover, had the State not suppressed this police report, McNeill's counsel could have called the police officers on the scene as witnesses to establish who had provided the descriptions. And although the majority alternatively states that the differing descriptions provided of the suspect was not material, materiality must be viewed collectively based on the cumulative effect of all the suppressed evidence. *Kyles*, 514 U.S. at 437.

leads.  Had McNeill's trial counsel known about this evidence, they could have attacked "the thoroughness and even the good faith of the investigation" by arguing that police failed to investigate other suspects matching those descriptions.  *Kyles*, 514 U.S. at 445.  Thus, there is little doubt that the police report is favorable to McNeill.

*iii.*

*Rushinsky Photo Lineup Recording:*  As explained above, following the State's direct examination of Rushinsky, the existence of a previously undisclosed tape recorded police interview with Rushinsky was revealed.  The recording was then played *in camera*.  But the recording was not entered into evidence and, following trial, McNeill's counsel was unable to obtain a copy of the recording until the federal district court granted McNeill's discovery request.

Although the recording showed inconsistencies between Rushinsky's trial testimony and his police interview, "[i]n general, the principles announced in *Brady* do not apply to a tardy disclosure of exculpatory information, but to a complete failure to disclose."  *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986) (citing *United States v. Holloway*, 740 F.2d 1373, 1381 (6th Cir. 1984)).  Thus, "[i]f previously undisclosed evidence is disclosed, as here, during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure." *Id.* (quoting *Holloway*, 740 F.2d at 1381); *see also Robertson v. Lucas*, 753 F.3d 606, 621 (6th Cir. 2014).

McNeill had the opportunity to cross-examine Rushinsky based on the inconsistencies that could be identified from the recording.  Moreover, while the recording contained Rushinsky's failure to identify McNeill in the initial photo lineup, the timing of the State's disclosure of the recording played no role in McNeill's inability to use the failed photo lineup to impeach Rushinsky's identification.  The recording alone gave no notice that Rushinsky had failed to identify McNeill.  All it established was that Rushinsky was shown "some pictures" and responded, "No.  No.  No.  No.  No." as to whether he saw "the guy who did this."  (R. 133-2 at PageID# 6053.)  It was the State's complete failure to disclose the Rushinsky police report, or otherwise inform McNeill that he was pictured in one of the photos that

Rushinsky could be heard on the recording failing to identify, that did not allow McNeill to impeach Rushinsky based on the photo lineup.  Accordingly, the State's delayed disclosure did not violate *Brady*.

*iv.*

*Rushinsky Hat Recording:* During federal discovery, McNeill obtained a previously undisclosed second police interview of Rushinsky.  During the interview, in reference to what the shooter was wearing, Rushinsky stated, "I remember the hat, the green hat." (R. 133-3 at PageID# 6056.) The detective responded, "That hat ain't green." (*Id.*)  Rushinsky then corrected himself: "It's like a khaki color, isn't it?" (*Id.*)  The detective responded: "Yeah.  Like a beige color." (*Id.*)

The district court held that "[t]his evidence was not favorable to McNeill, as it would not have 'resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense.'"  *McNeill*, 2019 WL 4017047, at *53 (quoting *Kyles*, 514 U.S. at 441).  Similarly, although the majority concedes that this evidence "would have cast some doubt on [Rushinsky's] memory of the true color of the suspect's clothing," the majority holds that this evidence was not favorable because "it would have little 'tendency to exonerate' McNeill."[4]  Maj. Op. at 14.

This analysis, however, appears to confuse the favorable element with the material element.  *See Kyles*, 514 U.S. at 441.  The Supreme Court has explained that "evidence [is] favorable to the accused" when it is "advantageous to [him]." *Banks*, 540 U.S. at 691.  And the Supreme Court has also explained that "the evolution over time of a given eyewitness's description can be fatal to its reliability." *Kyles*, 514 U.S. at 444.  This is especially so when the eyewitness is rated by the State as its "best witness[]." *Id.*  Considering that McNeill's defense was that he was falsely identified, evidence that Rushinsky's memory had to be rehabilitated by the police was certainly favorable.  And while it is true that this evidence alone is likely not

---

[4]The majority puts quotation marks around the phrase "tendency to exonerate" but, tellingly, provides no citation.  This is because the standard the majority applies to McNeill's *Brady* claims has been created out of whole cloth.  *Brady*'s favorable element only requires McNeill to show that the "evidence [is] advantageous to [him]"—not that the evidence would tend to exonerate him.  *Banks*, 540 U.S. at 691.  And even for the materiality inquiry, a defendant asserting a *Brady* claim "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Wearry*, 577 U.S. at 392 (quoting *Smith*, 565 U.S. at 75).

sufficient to undermine confidence in the verdict, materiality must be assessed based on the cumulative effect of all the suppressed evidence.  *See id.* at 437.

*v.*

*Roseboro Recording:* As explained above, during federal discovery, a previously withheld police interview of a Marko Roseboro was disclosed.  In the interview, Roseboro informed police that he had been with McNeill at the time of the shooting.  However, while alibi evidence is undoubtedly exculpatory, the State was not obligated to disclose this recording because we have held that "*Brady* obviously does not apply to information that is not wholly within the control of the prosecution.  There is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose."  *Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008) (quoting *Coe*, 161 F.3d at 344).  In other words, there can be no prejudice from the prosecution's failure to disclose evidence "if the defendant could have presented similar evidence to prove the same point that the allegedly-suppressed information would have been introduced to prove."  *Id.* at 415–16.  As the district court explained, McNeill filed a notice of alibi with the trial court stating that he was with Roseboro at the time of the offense, and he listed Roseboro as a witness.  Because McNeill knew about the alibi evidence and "'had as much access as the police' did to [Roseboro], the information [was] 'not under the sole control of the government,'" and the failure to disclose the Roseboro recording was not a *Brady* violation.  *Id.* at 417 (quoting *Coe*, 161 F.3d at 344).

C.

To sum up the prior section, the State suppressed three items of favorable evidence: (1) the police report detailing Rushinsky's failure to identify McNeill as the shooter in a photo lineup; (2) the police report detailing two descriptions of the shooter (that differed from Rushinsky's description), and the apprehension of a suspicious man fitting one of the descriptions; and (3) the recording of an interview with Rushinsky in which he had to be corrected by police on his description of the shooter's hat.  Thus, "the proper focus of *Brady*'s

materiality inquiry is on the cumulative effect of the suppressed evidence," *Bies*, 775 F.3d at 399, and whether McNeill has shown "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Kyles*, 514 U.S. at 435. However, because the majority (incorrectly) only analyzes the materiality of the Rushinsky police report, and because the State's suppression of that police report alone is enough to undermine confidence in the verdict, I put aside the remainder of the evidence suppressed by the State in the following materiality analysis.[5]

*i.*

"The main issue at trial was the identity of the killer." *McNeill*, 1997 WL 177635, at \*4. "Because the murder weapon was not found, nor was there any other physical evidence to link McNeill to th[e] murder, the state's case consisted primarily of eyewitness testimony." *Id.* at \*1.

Rushinsky was the State's star eyewitness. He testified unequivocally that he immediately recognized McNeill when he and Fulton pulled up to the corner of Massachusetts Avenue and G Street to purchase cocaine. As a basis for his identification, Rushinsky explained that he had a history of purchasing cocaine from McNeill. Nonetheless, because Rushinsky told the police that McNeill said, "My name ain't Freddie," McNeill's counsel sought to establish that

---

[5]Accordingly, as an aside, because the majority correctly holds that the warden waived the defense of procedural default as to the claims raised in McNeill's 1996 petition for postconviction relief, there is no need for this dissent to devote significant space to analyzing the warden's argument that McNeill procedurally defaulted the claims raised in his 2011 state court application for leave to file a motion for a new trial. However, I briefly note that, "[t]o qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed,'" *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)), and the Supreme Court has only considered judicially created rules crafted by a state's highest court to be firmly established, *see, e.g.*, *id.* at 317; *Johnson v. Lee*, 136 S. Ct. 1802, 1804–05 (2016) (per curiam). And even if a lower state court can firmly establish a procedural rule, the reasonableness standard appears to have been first applied in 2009, *see State v. Cleveland*, 9th Dist. Lorain No. 08CA009406, 2009-Ohio-397, ¶ 49—midway through McNeill's delay in filing the application for leave—and was not applied again until after McNeill filed his application in 2011, *see Walker*, 562 U.S. at 317 (holding that a rule was firmly established because the California Supreme Court had "framed the [rule] for habeas petitioners in a trilogy of cases."); *Johnson*, 136 S. Ct. at 1804–05 (same). Finally, even if a rule created by a lower state court can sometimes be considered firmly established within the district over which the court has appellate jurisdiction, a rule set forth in a panel decision from the Ohio Court of Appeals cannot be considered firmly established because "[a]ll opinions of the [Ohio] courts of appeals . . . may be cited as legal authority and weighted as deemed appropriate by the courts." Ohio S. Ct. R. Rep. Op. 3.4. As a result, "schisms have developed in districts as different panels announce conflicting opinions on identical issues of law, leaving litigants to guess which decision controls," and unless a court of appeals convenes an *en banc* proceeding, there is no "finality [or] predictability of the law within [the] appellate district[]." *McFadden v. Cleveland State Univ.*, 120 Ohio St. 3d 54, 2008-Ohio-4914, 896 N.E.2d 672, ¶¶ 15–16 (citations omitted).

Rushinsky did not actually recognize the shooter. (R. 117-4 at PageID# 4699.) But Rushinsky confidently reasserted that he knew it was McNeill. On redirect examination, Rushinsky explained that after Fulton had said "What's up, Freddie?," McNeill said "I ain't Freddie," but that he and Fulton had just "looked at each other and, okay, whatever" because they "already knew he was" Freddie. (*Id.* at PageID# 4714.)

The State itself recognized that Rushinsky was the key to its case against McNeill. During closing arguments, the prosecutor told the jury, "[n]ow obviously, a large part of the State's case is Robert Rushinsky," and warned the jury that it was "going to have to think very carefully about what he said and whether you can depend on that." (R. 117-5 at PageID# 4953.) In fact, the prosecutor boiled down the issue in the case to "does Robert Rushinsky plus the other evidence convince you beyond a reasonable doubt that [McNeill] killed Blake Fulton for $20?" (*Id.* at PageID# 4955.)

The State was correct to focus the jury's attention on Rushinsky's testimony. His testimony was devastating to McNeill's mistaken identification defense. Rushinsky's confident testimony about his longstanding relationship with McNeill, and his ability to immediately, and without any doubts, recognize McNeill, punched a gigantic hole through the heart of the defense's theory of the case.

But the jury was unaware of a strong reason not to depend on Rushinsky's testimony. Due to the State's suppression of evidence, the jury had no idea that Rushinsky had failed to identify McNeill in a photo lineup conducted on the night of the shooting. That is, mere hours after the shooting, when Rushinsky was shown a photograph of McNeill and asked whether he saw "the guy who did" the shooting, he responded, "No." (R. 133-2 at PageID# 6053.) While Rushinsky later allegedly positively identified McNeill, evidence that he initially failed to identify McNeill would have upended his credibility. No longer would Rushinsky have been the unassailable identifier that he was made out to be. The confidence that Rushinsky projected in identifying McNeill based on their allegedly longstanding relationship would have rung hollow.

In short, Rushinsky's flip flopping would have completely undermined the State's reliance on his testimony to implicate McNeill.**[6]**

In fact, the Supreme Court has consistently recognized the materiality of evidence impeaching the credibility of a key prosecution witness. *See Wearry*, 577 U.S. at 392; *Smith*, 565 U.S. at 75–76; *Banks*, 540 U.S. at 700–01; *Kyles*, 514 U.S. at 454; *Agurs*, 427 U.S. at 112 n.21; *Giglio*, 405 U.S. at 154–55; *Napue*, 360 U.S. at 269. For example, in *Smith v. Cain*, the prosecution failed to disclose that the only eyewitness to identify the defendant at trial had initially told police that he was unable to identify the perpetrator of the crime. *See* 565 U.S. at 74–75. The Supreme Court held that the "undisclosed statements alone suffice to undermine confidence in [the defendant's] conviction." *Id.* at 76.

*ii.*

Even though the majority recognizes that "Rushinsky's testimony may have been the strongest evidence supporting McNeill's conviction," based on the other evidence presented at trial, the majority "conclude[s] that there is no reasonable probability that the outcome of McNeill's trial would have been different if the prosecution had turned over the Rushinsky report." Maj. Op. 20–21. It is true that the Supreme Court has stated that "[i]f there is no reasonable doubt about guilt whether or not the additional [evidence] is considered, there is no justification for a new trial." *Agurs*, 427 U.S. at 112–13; *see also Smith*, 565 U.S. at 76 ("We have observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."). However, the remaining evidence here comes nowhere close to meeting the high standard envisioned by the Supreme Court.

In *United States v. Agurs*, the Supreme Court provided guidance on when the remaining evidence is strong enough to sustain confidence in the verdict notwithstanding the prosecution's

---

**[6]**Pointing to other evidence that "allowed the defense to cross examine Rushinsky on his knowledge of, and ability to identify, McNeill," the majority excuses the suppression of Rushinsky's failure to identify McNeill in the photo lineup because the jury heard these other "inconsistencies and chose to credit Rushinsky anyway." Maj. Op. at 20. While the majority apparently believes that a jury's decision to overlook one inconsistency means that no amount of inconsistencies would change the calculus, the amount and gravity of the inconsistencies identified in a witness' testimony matters when assessing the credibility of the testimony.

suppression of evidence impeaching an eyewitness. *See* 427 U.S. at 112–13 & n.21. The Supreme Court explained that such suppressed evidence might not be material "if there were fifty eyewitnesses, forty-nine of whom identified the defendant, and the prosecutor neglected to reveal that the other, who was without his badly needed glasses on the misty evening of the crime, had said that the criminal looked something like the defendant but he could not be sure as he had only had a brief glimpse." *Id.* at 112 n.21 (citation omitted).

Rather than apply this high standard, the majority improperly applies "a sufficiency of evidence test" and looks to whether, "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Hughbanks*, 2 F.4th at 540 (quoting *Kyles*, 514 U.S. at 434). The majority analyzes the remaining evidence introduced against McNeill and holds that this evidence could "have supported his conviction." Maj. Op. at 16. However, "[t]hat is not the test" for materiality. *Hughbanks*, 2 F.4th at 540. "[T]he question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles*, 514 U.S. at 453; *see also id.* at 435 n.8 ("This rule is clear, and none of the *Brady* cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone."). And the non-Rushinsky evidence here is not strong enough to sustain confidence in the verdict in the face of the suppressed impeachment evidence of the State's star eyewitness.

Without Rushinsky's testimony, the State's case was weak. As the prosecutor argued to the jury in closing, the non-Rushinsky witnesses were all meant to "back[] up what Rushinsky [told] you." (R. 117-5 at PageID# 4955.) In other words, the State essentially acknowledged that its "trial evidence resemble[d] a house of cards, built on the jury crediting [Rushinsky's] account." *Wearry*, 577 U.S. at 392–93 (citing *Agurs*, 427 U.S. at 113).

The most significant of the remaining evidence was the alleged eyewitness testimony of four young children, six- to eight-years-old at the time of the trial, who had been playing in the area of the shooting, and who were called to identify McNeill as the man who had shot Fulton eleven months earlier. However, in addition to the inherent unreliability of child testimony, *see Haliym v. Mitchell*, 492 F.3d 680, 707 (6th Cir. 2007) ("Age, like any factor that affects the ability of the witness to record and recount information accurately, is undoubtedly relevant to the

reliability of the eyewitness identification."); *see also Kennedy v. Louisiana*, 554 U.S. 407, 443 (2008) (discussing the "problem of unreliable, induced, and even imagined child testimony"), as even the State recognized in its closing argument, there were "inconsistencies in the testimony of these children." (R. 117-5 at PageID# 4958.)

Although T.R. identified McNeill in court as the shooter and explained that he was her neighbor, she conceded that she had not seen the shooting, and two of the other children confirmed that she was not on the scene at the time. B.P. testified that she had not seen the shooter's face and that she made an in-court identification of McNeill based on the photos shown to her by the police. R.G. had not identified anyone when the police showed him three photos and he had some trouble identifying McNeill in the courtroom. While C.S. identified McNeill in court, he testified that he only heard the shooting and that he only knew McNeill's name from one of the other children.

Moreover, T.R. and R.G. testified that the shooting occurred on the passenger's side of the car while B.P. and C.S. testified that it happened on the driver's side. T.R. and R.G. also testified that there had only been two men on the scene, and T.R. believed that McNeill was already on the scene before the man who was shot arrived alone in the car. As to the activity in which they had been participating in together at the time of the incident, the four children provided three different accounts—hide-and-go-seek, riding a bike, and bouncing a ball. *See Haliym*, 492 F.3d at 707 ("Where a witness is under a mistaken belief about facts that are closely connected to the facts surrounding the identification, that mistaken belief may cast aspersions on the witness' identification testimony."). Considering the childrens' age and the inconsistencies in their testimony, as the State told the jury, the value of the childrens' testimony was limited to the support it provided to Rushinsky's identification.

Despite the inconsistencies and weaknesses in the childrens' testimony, the majority asserts that "[i]t is not for us to make a determination as to the children's—or any other witness's—credibility" because "[w]e must give due deference to the jury's credibility determinations, as they saw the witness's testimony and cross examination on the stand." Maj. Op. at 18. But the cases cited by the majority—*Walker v. Engle*, 703 F.2d 959 (6th Cir. 1983), and *Brown v. Davis*, 752 F.2d 1142 (6th Cir. 1985)—concern challenges to the sufficiency of the

evidence. To be sure, when considering a sufficiency of the evidence claim we do not "consider the credibility of witnesses," *United States v. Geisen*, 612 F.3d 471, 488 (6th Cir. 2010) (quoting *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588–89 (6th Cir. 1999)), because "[a]ttacks on witness credibility are simple challenges to the quality of the government's evidence and not the sufficiency of the evidence," *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006) (quoting *United States v. Sanchez*, 928 F.2d 1450, 1457 (6th Cir. 1991)). Unlike a sufficiency of the evidence claim, however, when considering the materiality of a potential *Brady* violation, the quality of the inculpatory evidence must be considered in order to establish whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The majority's approach is simply not the law.[7]

Several non-eyewitnesses were also called to testify. None provided anything more than circumstantial evidence. *See McNeill*, 1997 WL 177635, at \*4 ("The state's case rested primarily on eyewitness testimony that McNeill had killed Fulton."). Kimberly Sanford, McNeill's ex-girlfriend, testified that on the day of the shooting McNeill had requested $30 from her, and that when she refused, McNeill had shown her a gun. She also testified that she was paid $220 to help the police locate McNeill.[8] Detective Arnie Berrios testified that drug dealers frequented the corner of Massachusetts Avenue and G Street, and that, in 1992, two years before

[7]Although the majority states that "[t]he dissent is correct that the question is not whether there was sufficient evidence to convict McNeill," and agrees that "we are required by *Kyles* to examine the quality of the children's testimony," Maj. Op. at 18, the majority cannot cure the shortcomings in its analysis by paying lip service to the proper standard for a *Brady* materiality inquiry. Despite citing the proper standard, the majority frames the materiality inquiry as whether the evidence aside from the Rushinsky police report "could . . . have supported [McNeill's] conviction," *id.* at 16, cites sufficiency of the evidence cases for the proposition that "[i]t is not for us to make a determination as to the children's—or any other witness's—credibility," *id.* at 18, and, in fact, provides full credibility to the childrens' testimony notwithstanding the substantial inconsistencies and weaknesses in their testimony.

[8]Although the majority correctly explains that it is not relevant to the materiality inquiry, it is worth noting that Sanford subsequently signed an affidavit recanting her trial testimony. In her affidavit, Sanford asserted that, although she had seen McNeill on the day of the murder, he had not asked her for money, and she had not seen him with a gun. According to Sanford, she lied because she was threatened by the police with being charged with murder and conspiracy to commit murder if she failed to cooperate and, after she agreed to cooperate, she was led to believe by the police that she would receive $5,000 if McNeill was convicted and sentenced to death. Similar allegations have been leveled in other cases against the prosecutor in this case. *See Cleveland v. Bradshaw*, 693 F.3d 626, 628 (6th Cir. 2012); *Davis v. Bradshaw*, No. 14-2854, 2016 WL 8257676, at \*26 (N.D. Ohio June 16, 2016), *report and recommendation adopted*, No. 14-2854, 2017 WL 626138 (N.D. Ohio Feb. 15, 2017), *aff'd*, 900 F.3d 315 (6th Cir. 2018).

Fulton's murder, he had arrested McNeill for selling drugs at that corner. Berrios also testified that he had helped arrest McNeill following the Fulton murder, and that he had found McNeill hiding in the back of a closet. Sergeant Richard Resendez testified that McNeill's mother lived on the same street as the shooting.

In short, as the State itself acknowledged, without Rushinsky's testimony, the case against McNeill was weak. McNeill's fingerprints were not found in the car. No blood spatter or gunshot residue was found on any of his clothes. The murder weapon was never recovered. Nothing linking McNeill to the crime was discovered at the scene of the crime. The non-Rushinsky eyewitness testimony consisted of the inconsistent and contradictory testimony of four young children. And the remaining circumstantial evidence merely established that McNeill's ex-girlfriend, who had been paid to testify, believed that McNeill had a gun on the day of the shooting and that he had wanted money; that, years earlier, McNeill had been one of many people selling drugs on the corner of Massachusetts Avenue and G Street; that McNeill's mother lived near the shooting; and that McNeill, an admitted drug dealer, was hiding when the police came to arrest him. Considering the lack of forensic or any other physical evidence implicating McNeill in the shooting, evidence impeaching the identification of the only adult eyewitness to the crime is certainly sufficient to undermine confidence in the jury's verdict. *See Miller v. Genovese*, 994 F.3d 734, 745 (6th Cir. 2021) (explaining the importance of a witness's testimony to the State's case when "[n]o physical evidence tied [the defendant] to the crime, and the State's other evidence—beyond [the challenged testimony] testimony—was weak."). The remaining evidence is nowhere near close enough to sustain confidence in the verdict in the face of the suppressed evidence showing that the State's star eyewitness—a man who testified that he had a longstanding relationship with McNeill—failed to identify McNeill in a photo lineup conducted mere hours after the crime. *See, e.g.*, *Agurs*, 427 U.S. at 112 n.21.

*iii.*

The Supreme Court's decision in *Kyles v. Whitley* confirms that, considering the evidence impeaching the State's star eyewitness's identification, the non-Rushinsky evidence does not suffice to sustain confidence in the verdict. In *Kyles*, "'the essence of the State's case' was the testimony of [four] eyewitnesses, who identified Kyles as [the] killer." 514 U.S. at 441 (citation

omitted). Undisclosed evidence reduced the credibility of the State's two best eyewitnesses. *See id.* at 441–44. One of those eyewitnesses had provided police with a description of the assailant that did not match Kyles, and the other had initially told police that, while he had seen the culprit, he had not seen the actual murder. *See id.* at 441–43. But one of the remaining unimpeached eyewitnesses had testified that there was "[n]o doubt in [his] mind" that Kyles was the murderer. *Id.* at 469 (Scalia, J., dissenting). The other unimpeached eyewitness had testified that "I know it was him . . . I seen his face and I know the color of his skin. I know it. I know it's him." *Id.* (Scalia, J., dissenting). There was also some "unscathed" physical evidence connecting Kyles to the crime. *Id.* at 451–52. Nonetheless, the Supreme Court explained that "the effective impeachment of one eyewitness can call for a new trial even though the attack does not extend directly to others," and held that the disclosure of the suppressed evidence "would have made a different result reasonably probable." *Id.* at 441, 445.

As in *Kyles*, undisclosed evidence about Rushinsky, the State's star eyewitness, substantially reduces the value of his identification. But there was far less remaining evidence introduced at McNeill's trial than at Kyles' trial. Unlike Kyles' trial, there was no physical evidence connecting McNeill to the crime. Moreover, in *Kyles*, there were two unimpeached adult witnesses who unequivocally testified that Kyles had committed the murder. The only limitation to their testimony noted by the Court was that they "had their best views of the gunman only as he fled the scene with his body partly concealed [by the victim's] car." *Id.* at 445. In McNeill's trial, the remaining eyewitnesses were four young children who provided inconsistent and contradictory testimony. Therefore, *Kyles* clearly establishes that the failure to disclose the evidence impeaching Rushinsky's identification of McNeill undermines confidence in the verdict and requires a new trial.[9]

---

[9] *See also Banks*, 540 U.S. at 677, 679–681, 685, 703 (holding that although the jury knew that Banks had murdered a 16 year old "for the hell of it," had violently attacked and threatened a relative shortly before the murder, and was willing to provide the "means and possible death weapon" for another individual to commit armed robberies, the suppression of evidence that a witness who testified that Banks intended to join in on robberies and had said that "'he would take care of it' if 'there was any trouble during these burglaries'" was a paid informant undermined confidence in the jury's determination that Banks "would commit criminal acts of violence that would constitute a continuing threat to society.").

*iv.*

Although the majority states that "[i]t is useful to compare the case before us to those in which our court, or the Supreme Court, has found evidence to be material," the majority goes about this comparison all wrong. Maj. Op. at 20. Start with *Kyles*. As explained above, *Kyles* is directly on point. But instead of relying on this precedent, the majority adopts the *Kyles* dissent's position. The *Kyles* dissent vociferously protested the *Kyles* majority's holding that impeachment testimony about one eyewitness can undermine confidence in the verdict when there are other unimpeached eyewitnesses. *See Kyles*, 514 U.S. at 469–470 (Scalia, J. dissenting). According to the *Kyles* dissent, "[e]ven if the undisclosed evidence would have allowed the defense to thoroughly impeach Beanie and to suggest the above possibilities, the jury could well have believed all of those things and yet have condemned petitioner because it could not believe that all four of the eyewitnesses were similarly mistaken." *Id.* at 463 (Scalia, J. dissenting). Although the quoted argument was rejected by the *Kyles* majority, to support its conclusion that the testimony of the children renders the State's suppression of evidence impeaching Rushinsky immaterial, the majority quotes this portion of the *Kyles* dissent. *See* Maj. Op. at 18. Tellingly, this quote from the *Kyles* dissent is the majority's only reference to the facts in *Kyles*. And considering the majority's apparent belief that the *Kyles* dissent is the law, it is perhaps unsurprising that the majority concludes that: "We . . . find the testimony of four eyewitnesses to be of sufficient quality that the further impeachment of one eyewitness, even the star eyewitness, is not enough to 'put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles*, 514 U.S. at 435); *but see Kyles*, 514 U.S. at 445.

While the majority may wish that the *Kyles* dissent is the law, it is not. No matter how much the majority prefers to rely on the *Kyles* dissent's application of *Brady* to the facts in that case, we are bound by Supreme Court majority rulings, not dissents. And the *Kyles* majority held that the eyewitness testimony of two unimpeached adult witnesses was not enough to overcome the suppression of impeachment evidence about the prosecution's two best eyewitnesses, even when there was inculpatory physical evidence. Therefore, *Kyles* demonstrates that the inconsistent testimony of the four young children is not enough alone to

overcome the suppression of impeachment evidence about Rushinsky—the State's star eyewitness.

Instead of comparing this case to *Kyles*, the majority highlights *Strickler v. Greene*. According to the majority, Sanford's testimony that McNeill had threatened her with a gun over a similar amount of money renders the suppression of evidence not material because, in *Strickler*, "the Supreme Court held that withheld evidence was not material in part because '[defendant] threatened [another member of the criminal enterprise] with a knife later in the evening.'" Maj. Op. at 19 (quoting *Strickler*, 527 U.S. at 292). "The other significant evidence in *Strickler*," *id.*, according to the majority's rendition of the case, "was that the defendant was seen 'driving [a] car . . . near the location of the murder,'" *id.* (quoting *Strickler*, 527 U.S. at 292). And because Fulton was murdered near McNeill's mother's house, the majority concludes that *Strickler* is directly on point.

But contrary to the majority's insinuation, the *Strickler* Court's reasoning for holding that the alleged *Brady* violation was not material was not limited to the two cherry picked quotations relied upon by the majority. The district court in *Strickler* had held that without the testimony tainted by the suppressed evidence, "the jury might have been persuaded that [the co-defendant], rather than petitioner, was the ringleader." *Strickler*, 527 U.S. at 291. After the Supreme Court in *Strickler* mentioned the two bits of evidence that the majority indicates was the basis for its decision, the Court stated: "*More importantly, however*, petitioner's guilt of capital murder did not depend on proof that he was the dominant partner: Proof that he was an equal participant . . . was sufficient under the judge's instructions. Accordingly, the strong evidence that [the co-defendant] was a killer is entirely consistent with the conclusion that petitioner was also an actual participant in the killing." *Id.* at 292 (emphasis added). "Furthermore," the Supreme Court explained, "there was considerable forensic and other physical evidence linking petitioner to the crime." *Id.* at 293. Thus, *Strickler* is inapposite.[10]

---

[10]The majority also highlight our decision in *France v. Lucas*. 836 F.3d 612 (6th Cir. 2016). As the majority itself points out, however, "an experienced DEA agent"—not four young children testifying inconsistently about what had happened eleven months earlier—provided the eyewitness identification that we held sufficed to sustain confidence in the verdict despite the alleged *Brady* material regarding a different eyewitness. *Id.* at 630. Moreover, the alleged *Brady* evidence actually considered in *France* "was merely evidence of [the eyewitness']

*v.*

In sum, "[c]onsidering the quality and quantity of the evidence that the State failed to disclose in this case, the potential for that evidence to have affected the outcome of [McNeill's] trial is inescapable." *Bies*, 775 F.3d at 399. The State's case relied primarily on Rushinsky's identification; but the State failed to disclose evidence that would have cast serious doubt on that identification. The undisclosed evidence that Rushinsky failed to identify McNeill in a photo lineup held on the night of the shooting (not to mention that Rushinsky's description of the shooter did not match the two descriptions received by police at the scene of the crime; that police had detained a man acting suspiciously who matched one of the descriptions; and that Rushinsky had trouble keeping his description of the shooter straight) would have undermined Rushinsky's identification. And undermining Rushinsky's identification—testimony which the State's remaining evidence was meant to support—would have caused the State's case to come toppling down like "a house of cards." *Wearry*, 577 U.S. at 392. To be sure, the lack of physical or forensic evidence does not "prove [McNeill's] innocence, and the jury might have found the eyewitness testimony of [the children] sufficient to convict, even though less damning to [McNeill] than that of [Rushinsky]. But the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles*, 514 U.S. at 453. And, for the reasons stated above, confidence in the jury's verdict cannot survive the State's suppression of evidence favorable to McNeill.

## III.

There is one more issue to be resolved before concluding that McNeill is entitled to relief. Although the preceding analysis applied a *de novo* review to McNeill's claim that the State violated *Brady* by suppressing the evidence showing that Rushinsky failed to identify him in a photo lineup conducted on the night of the crime, the warden argues that this Court is required to defer to the state court's decision denying McNeill's claim.

---

misdeeds"—it did not go directly to the eyewitness' identification, as is the case with the suppressed evidence about Rushinsky's initial failure to identify McNeill. *Id.*

A.

McNeill's federal habeas petition, filed in 2002, is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. § 2254, *et. seq. See Woodford v. Garceau*, 538 U.S. 202, 210 (2003). Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). "Under the 'contrary to' clause, a federal habeas court may grant the writ 'if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Lang v. Bobby*, 889 F.3d 803, 810 (6th Cir. 2018) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies the law or bases its decision on an unreasonable determination of the facts, in light of the record before the state court." *Id.* (citing *Richter*, 562 U.S. at 100; *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). However, when either the claim was not adjudicated on the merits, or the § 2254(d) requirements are satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (citations omitted); *Cassano v. Shoop*, 1 F.4th 458, 466 (6th Cir. 2021).

McNeill's *Brady* claim based on the Rushinsky police report was presented to the Ohio courts in his 1996 petition for state postconviction relief. In addition to affirming the trial court's

denial of the claim on procedural grounds, the Ohio Court of Appeals—the last state court to review the claim—provided an "alternative merits ruling" that triggers § 2254(d). *Brooks v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008).

"Deciding whether a state court's [merits] decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018) (internal quotations and citations omitted). "[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion . . . a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.* at 1192. But when the last state court to adjudicate the claim on the merits "does not come accompanied with those reasons . . . the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "should then presume that the unexplained decision adopted the same reasoning." *Id.*

The entirety of the Ohio Court of Appeals' merits analysis was: "McNeill alleged improper conduct by the state, but none of his evidence even suggested that the state did anything improper." *McNeill,* 738 N.E.2d at 28. This perfunctory discussion of McNeill's *Brady* claims provides no "specific reasons" to which this Court can defer. *Wilson*, 138 S. Ct. at 1192. Even assuming that the Ohio Court of Appeals applied the correct legal rule, there is no way to know whether it held that the evidence was not favorable, not suppressed, or not material. *See Strickler*, 527 U.S. at 281–82 (explaining that the prosecution only acts improperly when all three components of a *Brady* claim are present). And even if it was possible to determine that, for example, the Ohio Court of Appeals' decision was predicated on the favorable element, why the court so held remains a mystery. In other words, this decision provides no more "specific reasons" for the court's ruling that if the court had simply issued a one-word decision stating "denied." *Wilson*, 138 S. Ct. at 1192. Accordingly, AEDPA requires this Court to "look through" the Ohio Court of Appeals' decision, *id.,* to the Ohio trial court's decision "to review the actual grounds on which the state court relied," *Thompson v. Skipper*, 981 F.3d 476, 480

(6th Cir. 2020) (quoting *Coleman v. Bradshaw*, 974 F.3d 710, 719 (6th Cir. 2020)); *see also Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006) ("When the last state adjudication of the claim is silent or ambiguous, the federal court should look through to the last clear state decision on the matter." (quoting *Barrientes v. Johnson*, 221 F.3d 741, 779 (5th Cir. 2000))); *Helms v. Bowerman*, 785 F. App'x 274, 281 (6th Cir. 2019) ("Here, if there is any uncertainty on why the *Helms III* majority rejected his motion for reconsideration, we 'look through' the *Helms III* majority's denial and adopt the *Helms II* majority's rationale regarding due process.").

B.

The state trial court denied McNeill's *Brady* claim because the Rushinsky police report was not "a 'statement' within the meaning of [Ohio] Criminal Rule 16(B)(l)(g) and, thus, [was] not discoverable, as the notes are not in a narrative form, were not adopted by the witness, and were not recorded verbatim or nearly verbatim." (R. 116-4 at PageID# 2732.) The trial court also noted that the audio recording of the interview was disclosed in accordance with Rule 16(B)(l)(g) following the State's direct examination of Rushinsky. However, a state's criminal procedure rules cannot limit a defendant's constitutional right under *Brady* to receive from the state materially exculpatory evidence. *See Agurs*, 427 U.S. at 107; *see also* Maj. Op. at 15 n.4. Because the state court "applie[d] a rule different from the governing law set forth in [the Supreme Court's] cases," its reasons were "contrary to . . . clearly established Federal law" and are not entitled to AEDPA deference. *Lang*, 889 F.3d at 809–810 (quoting *Bell*, 535 U.S. at 694). Thus, for the reasons explained above, the State's suppression of materially exculpatory evidence entitles McNeill to a new trial.

Moreover, McNeill is also entitled to relief because a state court decision that "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]," is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States." *Williams*, 529 U.S. at 405, 412 (quoting 28 U.S.C. § 2254(d)(1)).

At McNeill's trial, there was no physical or forensic evidence linking him to the crime; the State's case primarily relied on a single star eyewitness—Rushinsky—bolstered by the

inconsistent eyewitness testimony of four young children. As explained above, in *Kyles*, the State relied on the testimony of four adult eyewitnesses, as well as physical evidence implicating the defendant. *See* 514 U.S. at 441–45, 451–52. As in *Kyles*, where the State suppressed evidence that would have harmed the value of its two best eyewitnesses, here, the State suppressed evidence that would have damaged Rushinsky's credibility. Although two of the eyewitnesses' testimony and some of the physical evidence were left unscathed, the Supreme Court in *Kyles* held that the "disclosure of the suppressed evidence . . . would have made a different result reasonably probable." *Id.* at 441.

There is no objective way to distinguish the suppression of evidence in McNeill's case from that in *Kyles*. In fact, McNeill presents a stronger *Brady* claim. At his trial, there was no physical evidence presented and the eyewitnesses unaffected by the State's suppression of evidence were young children who the State conceded provided inconsistent and contradictory testimony. Because *Kyles* presents a "set of materially indistinguishable facts," for this reason as well, AEDPA is not an impediment to McNeill obtaining relief. *Williams*, 529 U.S. at 412. Accordingly, for all the reasons explained at length above, the State's suppression of materially exculpatory evidence undermines confidence in the verdict and mandates that McNeill be provided a new trial.[11]

\*\*\*

Since at least 1972, it has been well established that the Constitution requires the prosecution to disclose evidence that would impeach the testimony of an incriminating witness. *See Giglio*, 405 U.S. at 154–55. Today, in a radical departure from that precedent, the majority blesses the suppression of such evidence. No longer must the prosecution disclose that its star eyewitness initially failed to identify the accused, says the majority. So long as there is some remaining evidence sufficient to support the jury's verdict, no matter how weak, the prosecution has a license to suppress evidence favorable to the defendant. And as a result of the majority's decision, even though the jury never knew that his main accuser failed to identify him shortly after the crime, the State of Ohio will execute Freddie McNeill, Jr.

---

[11]Because I would grant McNeill's petition on the grounds that his *Brady* rights were violated, I do not address his *Napue* claim.

But McNeill is entitled to a fair trial: a trial free from the State's suppression of evidence; a trial where he can present all of the favorable evidence to the jury; and a trial where the jury can adequately assess the credibility of his main accuser before reaching a verdict. The Constitution demands nothing less.

I therefore dissent.