RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0271p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

CLARENCE MACK,

*Petitioner-Appellant,*

*v.*

No. 22-3201

MARGARET BRADSHAW, Warden,

*Respondent-Appellee.*

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:04-cv-00829—Solomon Oliver Jr., District Judge.

Argued: November 17, 2023

Decided and Filed: December 19, 2023

Before: SUTTON, Chief Judge; WHITE and BUSH, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY F. SWEENEY, Cleveland, Ohio, John B. Gibbs, Cleveland, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

───────────────

## OPINION

───────────────

SUTTON, Chief Judge. An Ohio jury convicted Clarence Mack of aggravated murder arising from a 1991 carjacking. It recommended the death penalty. The judge agreed and imposed a capital sentence. After years of litigation in state courts, Mack petitioned for a writ of

habeas corpus in federal court, alleging several claims relevant to today's dispute: that prosecutors suppressed material evidence, that they introduced false testimony, that his trial counsel was ineffective, and that the state court denied him a fair trial when it denied the admission of certain testimony. The district court denied his petition. We affirm.

I.

On January 21, 1991, Peter Sanelli was shot and killed during a carjacking in downtown Cleveland on Prospect Avenue. He was shot three times at close range on the left side of his body. The entrance wound from one bullet indicated it went through another object, such as a car window, before striking him. Officers found three nine-millimeter shell casings a few feet from the curb and a fourth casing on the sidewalk. A copper-jacketed pellet was later found in the right sleeve of Sanelli's undershirt. Around an hour after the murder, police found Sanelli's car. Someone had crashed it into a utility pole, and the front driver's side and back passenger's side windows were broken. The rear passenger door had an apparent bullet indentation, and the front passenger seat had a bullet hole in the back. *See State v. Mack*, 653 N.E.2d 329, 331 (Ohio 1995).

Two days later, Timothy Willis contacted the police to tell them about the murder. *See id.* He provided a written statement about what happened. On the day of the murder, according to Willis, Clarence Mack, Thomas Sowell, and Reginald Germany drove to Willis's home. The trio was headed downtown to steal a car, and Sowell asked Willis for a gun. Willis did not have a gun, and the three men left. Later that evening, while walking to the recreation center, Willis saw Sowell and Mack again. They were driving a different car from the one used earlier in the evening, and Willis noticed that the front driver's side and back passenger's side windows were broken. Willis asked where they got the car, and Sowell said from Prospect Avenue downtown. Around that time, Willis spoke with Mack after seeing a news story about the murder. While laughing, Mack told Willis that he saw Sowell crash the car into a pole and injure his nose. *Id.* at 331–32.

Based on Willis's report, the police arrested Mack, Sowell, and Germany on January 23, 1991. Officers found a nine-millimeter gun concealed under Mack's coat. Mack admitted he

owned the gun but gave inconsistent accounts of how he got it.  At first, he claimed he bought the gun the day after the murder from a stranger.  Ballistics tests later showed that the three shell casings from the scene and the pellet from Sanelli's shoulder came from Mack's gun.  Upon learning this, Mack claimed that he bought the gun before the murder but loaned the gun to a stranger the day before the murder and got it back the day after.  *Id.* at 332.

The State charged Mack with aggravated murder and aggravated robbery.  The aggravated murder count carried a death-penalty specification and alleged that Mack was the "principal offender" in the murder based on the ballistics tests and his possession of the murder weapon.  R.170 at 6; Ohio Rev. Code Ann. § 2929.04(A)(7).  At trial, the State presented forensic evidence showing that two people fired shots from opposite sides of the vehicle (the other shots came from Sowell's weapon), that the shots broke the windows, and that the fatal shots came from Mack's gun.  Willis testified on behalf of the State.  His testimony remained largely consistent with his prior written statement, which implicated Mack, Sowell, and Germany.  But he added a statement from Mack.  In response to Sowell's explanation that he shot Sanelli for refusing to let them steal the car, Willis testified that Mack responded, "I shot because you shot."  R.150-3 at 75.  Mack did not testify at the trial, but the State admitted his various statements to the police about how he obtained the murder weapon.  *See State v. Mack*, No. 62366, 1993 WL 497052, at *5–6 (Ohio Ct. App. Dec. 2, 1993).  As part of Mack's alibi defense, a defense witness testified that Mack purchased the gun that killed Sanelli from Willis the day after the murder.  *Mack*, 653 N.E.2d at 334.

The jury convicted Mack and recommended the death penalty, finding Mack was the "principal offender" in the murder.  *See* Ohio Rev. Code Ann. § 2929.04(A)(7).  The trial court agreed and sentenced him to death.  *See Mack*, 653 N.E.2d at 334.  As for Sowell, a jury convicted him of aggravated robbery but found him not guilty of aggravated murder.  *See State v. Sowell*, No. 62329, 1993 WL 120265, at *2 (Ohio Ct. App. Apr. 15, 1993).

Mack appealed.  The Ohio Court of Appeals for the Eighth District affirmed his conviction and sentence.  *Mack*, 1993 WL 497052, at *1.  The Ohio Supreme Court likewise affirmed, *Mack*, 653 N.E.2d at 334, and the United States Supreme Court denied his petition for

a writ of certiorari. Mack filed various post-conviction petitions and appeals over the next eleven years, all to no effect.

In 2004, Mack filed a petition for a writ of habeas corpus in federal court. The district court allowed discovery and conducted two evidentiary hearings on Mack's claims. The district court then stayed the case to permit Mack to exhaust some of the new claims, including the *Brady* claim at issue today, in state court. The Ohio trial court held two further evidentiary hearings but ultimately denied Mack's petition. That ruling was upheld on appeal and the Ohio Supreme Court declined jurisdiction. Mack returned to federal court in 2018. *See* 28 U.S.C. § 2254. In an opinion stretching nearly two hundred and fifty pages, the court considered and rejected each of his claims. This appeal followed.

II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs our review. When a state court adjudicates the merits of a criminal case, federal courts may not grant a writ of habeas corpus unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or (2) "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). That is a daunting standard. State courts do not act "contrary to" federal law unless they directly contradict a Supreme Court decision on the same point or reach an opposite outcome "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Put another way, state courts do not act "unreasonabl[y]" merely by committing an error in construing federal law. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011). The error must be so egregious that all "fairminded jurists" would have seen it. *Id.* (quotation omitted). A state court's fact-finding likewise is not unreasonable even if a federal court would make a different finding in the first instance. *Wood v. Allen*, 558 U.S. 290, 301 (2010). The applicant instead must present "clear and convincing evidence" of a state court's error. *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting 28 U.S.C. § 2254(e)(1)). The district court denied Mack's petition, and we review that decision with fresh eyes. *Foust v. Houk*, 655 F.3d 524, 533 (6th Cir. 2011).

In conducting this deferential review of the state court's decision, we look to the last reasoned state court decision that adjudicated a claim on the merits. And we limit our analysis to the record and law as they existed at the time of that state court decision—here 2018. *Greene v. Fisher*, 565 U.S. 34, 38–39, 41 (2011).

III.

Mack claims that the prosecutor unlawfully withheld eight pieces of evidence in violation of the Fourteenth Amendment's Due Process Clause. *See Brady v. Maryland*, 373 U.S. 83 (1963). To succeed on a *Brady* claim, Mack must establish that (1) the prosecutor suppressed evidence, (2) the evidence is "favorable" to the defense, and (3) the evidence is "material" to the case. *Id.* at 87. As to the materiality requirement, Mack must show that, if the prosecutor had disclosed the suppressed evidence, "there is a reasonable probability" that the defendant would have been acquitted. *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

All agree that the state courts resolved this claim on the merits and that the Ohio Court of Appeals' 2018 ruling represents the last reasoned decision on it. *See State v. Mack*, No. 101261, 2018 WL 565704 (Ohio Ct. App. Jan. 25, 2018) (opinion on reconsideration). In rejecting the *Brady* claim, the state court held that one piece of evidence was disclosed, one did not exist, two were not favorable, and the remaining four were immaterial. *Id.* at *9–14. We look at each piece of evidence in turn.

*Disclosed evidence.* Begin with the evidence that the prosecutor, as the Ohio courts ruled, in fact provided to the defense—the evidence in Willis's written statement. Recall that, two days after the murder, Willis gave the police a written statement about Mack's and Sowell's involvement. In the statement, he described how Sowell, Mack, and another person came to his home on the day of the murder to ask for a gun so they could steal a car. He later saw Mack and Sowell driving a silver station wagon with a broken driver's side window and red and white plates. According to Willis's statement, Mack asked Sowell why he shot someone, and Sowell said: "[I]f he hadn't resisted he wouldn't have got shot." R.154-9 at 60.

The state court found that the prosecutor disclosed the evidence in Willis's written statement. *Mack*, 2018 WL 565704, at *10. That conclusion does not unreasonably assess the

facts or federal law. During discovery, the prosecutor disclosed that Willis made this statement and summarized its contents for Mack's attorney. The trial transcript shows that, while cross-examining Willis at trial, Mack's attorney asked for and received a copy of the statement. The prosecutor and Mack's attorney confirmed this in later testimony. Mack, in short, had a summary of the statement before trial and the chance to review the statement during trial. No suppression of evidence occurred. *See United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002).

*Non-existent evidence*. Turn to the evidence that the state appellate court reasoned did not exist—a plea agreement between Willis and the prosecutor. The state court rejected Mack's claim that the prosecutor failed to disclose a plea deal with Willis to swap testimony for favorable treatment in an unrelated criminal case against Willis. *Mack*, 2018 WL 565704, at *12–13. Willis denied the existence of any deal when Mack's attorney cross-examined him. The prosecutor testified that he did not enter into any agreement with Willis, and Willis's attorney denied any plea deal. On this record, the state court found that there was no deal and hence nothing to disclose.

Mack insists that there must have been at least a tacit deal based on various pieces of circumstantial evidence. In a meeting between Willis and the prosecutor before trial, he notes, the prosecutor made a notation about Willis's own upcoming trial for unrelated charges, jotting down the names of the judge and Willis's defense attorney. Then, he adds, the prosecutor asked the State to continue investigating Willis's case, and eventually the State dismissed the charges against Willis. Last of all, he notes, an experienced detective, years after the trial, said that there "appeared to be" a deal based on "notes he read." R.154-11 at 66.

Whether taken together or apart, these pieces of evidence do not show that the state courts unreasonably handled this part of the *Brady* claim. The prosecutor asked for further investigation because Willis received threats shortly before testifying, and the prosecutor suspected that Willis had been set up for the unrelated criminal charges. The State dismissed the case against Willis, the state court found, after the victim died for unrelated reasons, not because of an undisclosed deal. *See Mack*, 2018 WL 565704, at *13. The detective's highly speculative testimony does little more. Those in the best position to know about any deal—Willis, his attorney, and the prosecutor—denied any agreement.

Both before and after any alleged plea deal, there were valid explanations for what happened. Long before the robbery that led to the criminal charges against Willis, he had already identified Mack and Sowell as involved in the carjacking. That statement did not, and could not, have had anything to do with a plea deal. And by the time the State dismissed the charges against Willis, there was a valid, independent reason for that decision: the death of the victim, on whose testimony the case depended. Consistent with the district court's ruling in this case, Mack has not shown by clear and convincing evidence that the state court erred in finding that no plea agreement existed. In any event, Mack had the chance to impugn Willis's motives at trial: Mack's attorney questioned Willis about a potential reward for his testimony and then claimed Willis himself was involved in the murder. The jury considered Mack's attempts to tarnish Willis's motives but convicted him anyway.

*Non-favorable evidence.* The state court held that two police reports about Sanelli's car did not favor Mack, and the prosecutor as a result did not have a duty to disclose them. *Mack*, 2018 WL 565704, at *11–12. The first report indicates a person resembling Sowell crashed Sanelli's car into a utility pole. The Ohio Court of Appeals found this unhelpful to Mack's defense. If anything, it concluded, the evidence buttressed Willis's credibility because he testified that Sowell crashed the car and hurt his nose. *See id.* at *11–12.

Mack responds that the report says that one person crashed and exited the car (Sowell), while Willis testified that he saw Mack and Sowell in the car at the recreation center. That detail does not impeach Willis. He never claimed both men were in the car when it crashed, only when they arrived at the recreation center. Nearly five months before trial in any event, the prosecutor disclosed the names of the witnesses to the crash. *See Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998) (finding no *Brady* violation when a defendant "knew or should have known the essential facts permitting [a defendant] to take advantage of any exculpatory information") (quotation omitted). This first report was not favorable, and in any event the prosecutor did not suppress it.

The second report recounts how two people pulled up to the abandoned car (after it struck the utility pole), and one of the pair entered the car and reversed it a few feet. The two individuals then left the scene after one of them worried that the car might be stolen. This report lacks any exculpatory or impeachment value. *See Mack*, 2018 WL 565704, at *11–12. Whether

someone moved Sanelli's car a few feet after Sowell crashed it does not say anything one way or the other about Mack's involvement in the murder. Nor does it conflict with any of Willis's testimony.

Mack responds that Willis told the Sanelli family that Sowell left a nine-millimeter clip in the car, and the police did not find a clip when they recovered the car. By Mack's lights, this shows that the person who moved the car must have taken the clip and thus was the murderer. That is possible, to be sure, as indeed many things are possible. But the theory requires far too many inferential leaps, none of them otherwise corroborated by the record, to create a cognizable *Brady* claim, much less to show that the state courts unreasonably rejected this one.

*Materiality.* The state court ruled that the remaining four pieces of evidence—the Sanelli family's notes, two police reports, and the prosecutor's notes—did not prejudice Mack. *Mack*, 2018 WL 565704, at *14. Taken together or examined singly, they did not create a "reasonable probability" of a different outcome. *Strickler*, 527 U.S. at 296. That's because, as the state court found, the prosecution presented strong evidence to support Mack's conviction and sentence. Mack was arrested while in possession of the gun that killed Peter Sanelli. *See Mack*, 1993 WL 497052, at *4. Forensic tests confirmed what no one denies: that this gun fired the fatal shots. While Mack tried to give various statements to the police about how he obtained the gun, all introduced at trial, a jury could fairly find that none of them made sense. The jury heard two inconsistent explanations from Mack (that he bought it before the murder from a stranger or that he bought it after the murder from a different stranger) and still another explanation from a trial witness (that he bought the gun from a known acquaintance, Willis). *See Mack*, 653 N.E.2d at 332, 334. By contrast, Willis consistently implicated Mack in the murder from his first written statement up through his trial testimony. *See Mack*, 1993 WL 497052, at *5. Other evidence corroborated Willis's testimony: He provided an accurate description of Sanelli's car and correctly identified it for police; he knew that the firearm used in the murder was a nine-millimeter handgun; he said that Sowell had a pair of binoculars after the murder, and later testimony showed that Sanelli always kept a pair of binoculars in his car; and he testified that Sowell crashed the car into a pole, a point confirmed by police and eyewitnesses. *See id.* at *2, 4–6; *Mack*, 653 N.E.2d at 331–32.

All of this amounts to a reasonable application of the *Brady* prejudice test by the state courts, as an assessment of each of the four pieces of evidence confirms. Start with the notes taken by the Sanelli family during a conversation with Willis. Two days after the murder, Willis contacted the Sanelli family at their glass business to provide information about Peter Sanelli's murder. The family took brief notes of the conversation, and no one shared them with Mack. *Mack*, 2018 WL 565704, at *9. The notes mention Sowell by name and provide a description of him, but the notes do not name Mack. They reference a "man" (singular) that Willis heard talking (presumably about the murder) at the recreation center. R.154-9 at 50. After that, the notes indicate there "were 2 guys" and that one or both of them "had [a] 9 mm gun." *Id.*

Mack maintains that the state courts overlooked the notes' "game-changing significance." Appellant's Br. 57. As he sees it, the notes show that Willis changed his story over time (the notes reference a "man" at the recreation center, but Willis said Mack and Sowell were there) and that Willis got certain facts wrong (the notes say Sowell wore a Lakers or Raiders jacket, when Sowell wore a Bulls jacket). R.154-9 at 50. Through it all, Mack maintains that the notes support his alibi defense because they "identify *someone else* as the shooter." Appellant's Br. 57.

But this overstates what the Sanelli family's notes say. The notes do not identify Sowell as the only shooter. In truth, the notes do not identify anyone as *the* shooter. They name Sowell and provide a description of him, but Mack incorrectly infers that this points the finger at Sowell alone. The notes indicate that at least two people were involved. A member of the Sanelli family later confirmed that Willis "never" said "only one person [was] involved." R.151-9 at 100. In addition, the notes do not contradict Willis's testimony that he heard two men at the recreation center talking about Sanelli's murder. After they state that Willis heard a "man" talking, they say that there "were 2 guys." R.154-9 at 50. Superficial differences between the notes and Willis's later statements also do not undercut the State's case. That Sowell purportedly wore a Raiders or Lakers jacket—when in fact he wore a Bulls jacket—modestly undercuts Willis's statement (he got the team wrong) and partially confirms it (he correctly saw him in a professional sports jacket). Of course, this trial did not concern Sowell's offense; it concerned Mack's offense, making the modest mistake one about a tangential issue. *Cf. Beuke v.*

*Houk*, 537 F.3d 618, 635 (6th Cir. 2008) (rejecting *Brady* claim because any inconsistencies went to "tangential issues," not "important" ones like "guilt").

Turn to the police report summarizing Willis's written statement and a phone call Willis made to police on the day of the murder. In the report, Willis says that Sowell "shot" Sanelli but that Mack and another accomplice were also involved. R.154-9 at 52. The report adds that Willis gave his written statement after viewing Sanelli's car. Mack maintains that this report points the finger at Sowell and makes suspect Willis's identification of the car.

But this report largely duplicates the evidence at trial, making it immaterial. Recall that Willis's written statement also names Sowell as a shooter and says Mack was involved. The written statement, moreover, includes the detail that Willis identified Sanelli's car before giving his statement to police. The existing evidence, in other words, provides the same exculpatory and impeachment value as the suppressed report. *See Bales v. Bell*, 788 F.3d 568, 574 (6th Cir. 2015) (cumulative evidence is not material). Keep in mind, moreover, that Sowell *was* a shooter, as the facts at trial confirmed. He just did not fire the fatal shots.

Turn to the police report stating that Willis visited the Sanelli family a second time to tell them that he contacted the police. Mack claims that this shows bias and that Willis returned to increase his chances of getting a reward. *See Mack*, 2018 WL 565704, at *11. The report simply does not support the claim. It says only that Willis told the family that he contacted the police and then left.

Turn to the prosecutor's notes about a June 1991 meeting with Willis. The notes include information about Willis's upcoming trial for an unrelated robbery. Mack claims that, at this meeting, Willis reached a deal with the prosecutor to incriminate Mack in exchange for help with Willis's criminal charges—and specifically changed his story to add Mack's inculpatory statement: "I shot because you shot." Appellant's Br. 30. The prosecutor's notes do not contain this statement. The prosecutor testified years later that he did not remember when Mack first relayed it but "imagine[d]" he first heard it at this meeting. R.101 at 47. Mack's trial counsel testified that the first time he heard this incriminating statement was during Willis's testimony at trial.

As shown, however, the state court reasonably found that a deal did not exist. The statement "I shot because you shot" came out during trial anyway. And Mack had a full opportunity to cross-examine Willis on this point and probe the consistency of his testimony with prior statements. *See Joseph v. Coyle*, 469 F.3d 441, 472 (6th Cir. 2006) (delayed disclosure does not violate *Brady* absent prejudice). Confirming the absence of prejudice, Mack never asked for a continuance to develop his cross-examination further. *See id.* (decision not to seek a continuance undercuts claim of prejudice).

These four pieces of evidence at best weakly support Mack's defense. They largely duplicate the evidence available at trial anyway. And they fail to undercut the most incriminating evidence—that Mack was at the scene of the crime with Sowell, he was found with the murder weapon, forensic evidence made clear it was the murder weapon, and Mack offered inconsistent and unsatisfying explanations for why he had the weapon. On this record, the district court correctly ruled that the state court reasonably determined that this evidence did not generate "a reasonable probability" of a different result at trial. *Strickler*, 527 U.S. at 280.

Mack's other arguments with respect to this evidence also come up short. Contrary to his claim, it is not true that the state court made individual, rather than cumulative, determinations of materiality. *See Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995); *Bies v. Sheldon*, 775 F.3d 386, 399 (6th Cir. 2014). The state court correctly addressed the significance of each piece of evidence individually. *Mack*, 2018 WL 565704, at *8–14. Only after doing that did it "[c]onsider[] this evidence as a whole." *Id.* at *14.

Nor is it the case that the state court mistakenly applied a sufficiency-of-the-evidence standard by discounting suppressed evidence in light of the evidence introduced at trial. True, the *Brady* materiality inquiry "is not a sufficiency of the evidence test." *Kyles*, 514 U.S. at 434. True also, Mack need not show that the alleged *Brady* violations make the evidence as a whole insufficient to sustain a conviction. *Id.* What Mack must show instead is that the suppressed evidence could "undermine confidence in the verdict." *Id.* at 435. That's just what the state court did, however. It never held that the suppressed evidence was immaterial merely because there was still enough evidence to convict Mack. It instead rightly considered the effect of any undisclosed evidence in the light cast by the totality of the evidence introduced at trial. *See*

*Mack*, 2018 WL 565704, at \*9–14; *see also Strickler*, 527 U.S. at 294 (undisclosed evidence did not create a reasonable probability of a different result because of other "strong" evidence for conviction); *McNeill v. Bagley*, 10 F.4th 588, 604 (6th Cir. 2021).

Mack separately claims that the state court failed to consider the effect of the suppressed evidence on his sentence, as opposed to his conviction, and that AEDPA deference as a result does not apply to this claim. It is not obvious that Mack has "very clearly" shown that the state court overlooked the effect of any suppressed evidence on his sentence, *Rogers v. Mays*, 69 F.4th 381, 388 (6th Cir. 2023) (en banc) (quotation omitted), or that fresh review applies even if it did overlook this point, *see Richter*, 562 U.S. at 98 (applying deference "when a 'claim,' not a component of one, has been adjudicated"); *cf. Hodges v. Colson*, 727 F.3d 517, 537 (6th Cir. 2013). But the point does not make a difference. Either way, Mack has not shown a "reasonable probability" of a different sentence.

None of the suppressed evidence contradicts Willis's testimony or the forensic evidence. And once the jury found him guilty, the forensic evidence in this case takes on more significance in determining the appropriate sentence. *Strickler*, 527 U.S. at 293–94 (finding no prejudice in capital case because of "considerable forensic and other physical evidence linking petitioner to the crime"). The suppressed evidence does not provide any insight into the configuration of the murder scene. Willis placed Sowell and Mack at the scene and said both of them shot at Sanelli, but he never claimed any knowledge about who shot from which side of the vehicle. The best evidence on this score comes from the ballistics reports indicating Mack's gun fired the shots that killed Sanelli. Mack's possession of the murder weapon—and his inability to offer a consistent and innocent explanation why—strongly suggests that he fired the fatal shots. The suppressed evidence does not weaken that evidence, undermining any claim of prejudice on this score.

## IV.

*False testimony.* Mack separately claims that the prosecution introduced false testimony at trial, which violates the Fourteenth Amendment. *See Napue v. Illinois*, 360 U.S. 264 (1959). To succeed on this claim, Mack had to show that the prosecutor knowingly used a false, material

statement to obtain the conviction. *Id.* at 269; *see McNeill*, 10 F.4th at 604. A false statement is "material" when it could have affected the jury's decision "in any reasonable likelihood." *Napue*, 360 U.S. at 271; *see McNeill*, 10 F.4th at 604.

Mack argues that Willis perjured himself when he testified that (1) he did not have a plea deal with the prosecutor; (2) he saw Sowell and Mack while walking to an event at the local recreation center, even though it was a holiday and the recreation center was apparently closed; and (3) he never owned a gun. In resolving this claim, the Ohio Court of Appeals concluded that Mack failed to provide evidence that the prosecutor knew Willis perjured himself. *Mack*, 2018 WL 565704, at *13. That ruling reasonably applied federal law, as the district court concluded.

Mack does not offer any cognizable evidence of a plea deal, as shown above. As for the other claims, Mack has not presented sufficient evidence to question that ruling—either because the prosecutor knew Willis was lying about seeing Mack and Sowell at the recreation center or about owning a gun. *Id.* Mack has not provided any evidence that the prosecutor knew Willis lied about seeing Mack and Sowell at the recreation center, only some evidence (gathered years later) that the center was closed that day. Willis likewise gives no evidence about what the prosecutor knew regarding Willis's ownership of a firearm, only insinuations that Willis did own a gun because of his criminal background. That does not suffice to overcome AEDPA's stiff standard for reviewing state court criminal convictions.

V.

*Ineffective assistance of counsel.* Mack argues that his trial counsel was constitutionally ineffective in the guilt and penalty phases under the Sixth and Fourteenth Amendments because he failed to argue that Mack was innocent even under the State's theory. The turning point of the argument is that Willis testified that he saw Mack sitting in the passenger seat of Sanelli's car at the recreation center and yet forensic evidence shows the killer shot at the driver's side of the car. According to Mack, this shows he could not be the principal offender because, even if he was there, he fired at the passenger's side. *See* Ohio Rev. Code Ann. § 2929.04(A)(7); *State v. Taylor*, 612 N.E.2d 316, 325 (Ohio 1993) (stating that the "principal offender" under this statute means "the actual killer").

The Ohio Court of Appeals rejected this argument on forfeiture and claim-preclusion grounds. *Mack*, 2018 WL 565704, at *6. It noted that Mack raised ineffective-assistance claims in the first state court appeal, then again in his first postconviction relief petition, and then again in a motion to reopen his direct appeal. *Id.* Yet through it all, this particular theory, clearly "known at the time" of those appeals, was never raised and "should have been advanced" in those prior proceedings. *Id.* As an independent and adequate state-law ground, this procedural ruling premised on state law typically prevents federal review. *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991).

Mack claims that his actual innocence of the charged crime excuses the procedural default. *See Schlup v. Delo*, 513 U.S. 298, 316 (1995). But this contention requires "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial" without addressing the alleged constitutional error. *Id.* On that demanding standard, Mack must show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992); *see Frazier v. Jenkins*, 770 F.3d 485, 497 (6th Cir. 2014). Mack does not clear that hurdle. The key problem is this: Just because Willis saw Mack sitting in the passenger seat soon after the murder, that does not mean Mack necessarily shot at the passenger's side of the car. He could very well have fired at the driver's side but sat on the passenger's side. His seat selection says nothing about where he stood (or sat) while shooting.

A similar problem encompasses Mack's reliance on Willis's testimony that Sowell brushed glass out of his shirt after exiting Sanelli's car. Both shooters, the evidence suggests, fired through glass windows. *Mack*, 653 N.E.2d at 331.

Switching gears, Mack claims that the ineffectiveness of his post-conviction trial counsel excuses the default. That theory also fails. Federal courts may hear otherwise defaulted ineffective-assistance claims only under certain conditions. Among other things, a petitioner must show that state law prohibits raising ineffective-assistance claims on direct appeal or that it makes it "highly unlikely" for a petitioner to have a "meaningful opportunity" to do so. *See Trevino v. Thaler*, 569 U.S. 413, 429 (2013); *Martinez v. Ryan*, 566 U.S. 1, 13–15 (2012); *Rogers v. Mays*, 69 F.4th 381, 395 (6th Cir. 2023) (en banc). Ohio law requires that defendants

raise on direct appeal any ineffective-assistance claims that do not depend on evidence outside the record. *Mammone v. Jenkins*, 49 F.4th 1026, 1048 (6th Cir. 2022). Mack's argument relies on evidence in the record, allowing us to excuse his procedural default only if he lacked a "meaningful opportunity" to raise it on direct appeal. *Id.*

Mack had a meaningful opportunity to raise this issue on direct appeal. In fact, he *did* raise ineffective-assistance claims on direct appeal. *See Mack*, 2018 WL 565704, at \*6. He argued that his trial counsel was ineffective for failing to object to a jury instruction and failing to call witnesses. *Id.* In his postconviction petition, he then raised new versions of the claim: Counsel was ineffective for failing to "obtain independent ballistics analysis," failing to properly cross-examine Willis, and failing to call certain witnesses. *Id.* He raised more ineffective-assistance claims in his motion to reopen his direct appeal. *Id.*; *see State v. Mack*, No. 626366, 2003 WL 21185786 (Ohio Ct. App. May 19, 2003).

Mack tries to head off this conclusion by pointing out that he had the same counsel at trial and on his direct appeal, and thus his first opportunity to review this claim was during post-conviction review. True, we have suggested before that identical counsel at trial and on appeal could matter for this analysis. *See, e.g.*, *Whiting v. Burt*, 395 F.3d 602, 621 (6th Cir. 2005). But Mack's argument fails to account for the reality that he raised ineffective assistance claims in his direct appeal, even though he had the same counsel at trial. If he could have raised ineffective-assistance arguments then, he could have raised this variation on those themes at the same time as well. Mack had a full opportunity to raise this claim. He failed to do so, and that failure bars further review.

## VI.

*Prohibited testimony.* Mack argues that the trial court violated his rights to due process, a fair trial, and to present a defense under the Sixth and Fourteenth Amendments when it refused to allow Curtis Mack and Carole Mancino to testify. Curtis Mack, Mack's cousin and the brother of another co-defendant in the Sanelli murder, would have testified that Willis admitted to killing Sanelli. Carole Mancino, one of Mack's trial attorneys, would have testified that, during an interview with Willis at the jail, Willis said he "can't believe" Mack would kill

someone, that he didn't see Mack on the day of the murder, that he didn't call the police, and that he could "make [his] statements fit into any story anyone wants to hear." R.150-4 at 122–25.

The Ohio Supreme Court rejected these arguments in 1995. It found that, under the Ohio rules of evidence, all but one of the statements lacked the proper foundation because Willis was not given the chance to explain or deny them. *Mack*, 653 N.E.2d at 339. The sole exception was Carole Mancino's claim that Willis told her he never called the police. *Id.* But while the trial court should have allowed that testimony, the Ohio Supreme Court found no prejudice resulted because of "an abundance of other credible inculpatory evidence." *Id.*

Federal habeas review does not grant us the power to review the Ohio Supreme Court's rulings on matters of state evidence law. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). We may consider only whether "the application of these evidentiary rules rendered [Mack's] trial fundamentally unfair," which is no mean feat. *Chambers v. Mississippi*, 410 U.S. 284, 289–90 (1973); *see Cupp v. Naughten*, 414 U.S. 141, 147 (1973). We ask only whether the evidentiary rulings denied Mack "a fair opportunity to defend against the State's accusations" under the Due Process Clause of the Fourteenth Amendment. *Chambers*, 410 U.S. at 294. Due process "does not compel" States to allow "evidence that is unreliable" or of "questionable exculpatory value." *Turpin v. Kassulke*, 26 F.3d 1392, 1398 (6th Cir. 1994); *see Chambers*, 410 U.S. at 300–01. The parties dispute the appropriate standard of review. Whether deferential or fresh, however, the result is the same. The exclusion of this testimony did not make Mack's trial fundamentally unfair.

Start with the testimony of Mack's cousin that Willis admitted to killing Sanelli. This testimony could have helped Mack's defense, to be sure. But it also came from Mack's cousin and the brother of another co-defendant, a set of family relationships that weakens its value. Adding to this problem, the testimony was not corroborated, including by Mack in his statements to the police soon after the murder. *Cf. Turpin*, 26 F.3d at 1397–98 (state court did not violate the Constitution by excluding weakly corroborated statements).

Had Mack asked the appropriate questions, things might have turned out differently. The Ohio Supreme Court ruled the testimony inadmissible only because Willis never received an

opportunity to explain or deny this supposed confession. *Mack*, 652 N.E.2d at 339. With proper foundation, the testimony would no longer present the same problems and may well have been permitted at trial. Ensuring Willis had a chance to respond to this statement—and conditioning the admission of Mack's cousin's statement on that opportunity—reflects "a rational and proportional means of advancing the legitimate interest in barring unreliable evidence." *United States v. Scheffer*, 523 U.S. 303, 312 (1998); *see Chambers*, 410 U.S. at 295.

Mack had other opportunities, moreover, to challenge Willis's credibility and to suggest his involvement. Mack's attorney subjected Willis to cross-examination on potential ulterior motives, then argued before the jury that Willis committed the murder. True, a jury could also sift these matters and determine the cousin's credibility for itself. But the question is not what we would have done had we been the state trial judge. It is whether the Constitution requires the admission of a cousin's (and a brother's) uncorroborated testimony because, without it, the trial could not be fair under the Sixth and Fourteenth Amendments. It does not in this instance. *Turpin*, 26 F.3d at 1398 ("[T]he issue before us is not whether it would have been wiser" to "let a jury determine the exculpatory value and reliability" of testimony, only "whether the trial judge's failure to do so violated the minimal requirements of the Fourteenth Amendment's Due Process Clause.").

Much the same is true of the testimony of Carole Mancino, one of Mack's attorneys. She interviewed Willis while he was incarcerated in the same jail as Sowell, Mack, and a third co-defendant. When cross-examined about his conversation with Carole Mancino, Willis consistently noted his reluctance to discuss the case: "I'm in jail, these guys in jail, I ain't going to do no talking in jail. People wind up dead in jail[.]" R.150-3 at 147. That context for their conversation "bears on its credibility." *Jackson v. Denno*, 378 U.S. 368, 386 n.13 (1964). And while the trial court did not allow Carole Mancino's testimony, it did allow Mack's attorney to cross-examine Willis about this conversation. *Cf. Chambers*, 410 U.S. at 294. The trial court's decision to disallow this testimony did not violate due process.

VII.

The jury convicted Mack of aggravated robbery in 1991—nearly thirty years after the last execution in Ohio. The conviction came five years before the State required all juries to be instructed that a life sentence prohibits parole, *State v. Raglin*, 699 N.E.2d 482, 489 (Ohio 1998), a state law development linked with a significant reduction in the imposition of capital sentences, *see* Steven J. Mulroy, *Avoiding "Death by Default": Does the Constitution Require a "Life Without Parole" Alternative to the Death Penalty?*, 79 Tul. L. Rev. 401, 441–43 (2004). Since then, we have not seen a lot of capital sentences for aggravated robbery. Whether Mack's case should be reduced to life without parole through the clemency process is not for us to decide. But the possibility is worth acknowledging.

We affirm.